**UNITED STATES of America, Plaintiff,**

v.

**MERCEDES–BENZ OF NORTH AMERICA, INC., Defendant.**

**No. C–79–2144–MHP.**

United States District Court,
N. D. California.

May 29, 1981.

Anthony E. Desmond, Antitrust Div., Dept. of Justice, San Francisco, Cal., for plaintiff.

Malcolm T. Dungan, George A. Cumming, Jr., Brobeck, Phleger & Harrison, James E. Ratcliff, Thatcher, Jones, Casey & Ratcliff, San Francisco, Cal., for defendant.

## OPINION AND ORDER

PATEL, District Judge.

This action is before the court on cross-motions for summary judgment. The parties have generated a lengthy record consisting primarily of documentary and deposition evidence. The government brings suit for an alleged violation of § 1 of the Sherman Act under a theory of a per se tying violation based on the Dealer Agreement between Mercedes-Benz of North America, Inc. [MBNA] and each Mercedes-Benz franchised dealer. Defendant strenuously objects to the application of a per se rule and argues that a rule of reason should apply under which MBNA has demonstrated that in fact its Dealer Agreement and actual practice do not constitute a restraint of trade. Because the government has introduced no evidence showing that defendant engaged in a course of conduct involving coercion, threats or intimidation, MBNA urges this court to grant summary judgment on its behalf.

While summary judgment is to be used sparingly in antitrust litigation where motive and intent are crucial factors, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the use of summary procedures is not foreclosed, particularly in cases involving alleged per se violations where "the gist of the case turns on documentary evidence." *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963). The appropriate factors to be considered in a summary judgment motion recently have been set out in *In re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1102 (N.D.Cal.1980) [*Data General*] and need not be repeated here.

After careful consideration of the lengthy record and all pleadings by counsel, the court finds it necessary to deny both motions for summary judgment. The parties must proceed to trial on the issue of defendant's economic power and, if that be established, whether defendant can demonstrate sufficient business justification for a tying arrangement.

## I.

## BACKGROUND

Defendant MBNA has been the exclusive United States distributor of Mercedes-Benz automobiles since 1965. Its parent company, Daimler-Benz AG [DBAG] of Stuttgart, Germany, is one of the oldest automobile manufacturers in the world. It is conceded by both parties that the Mercedes-Benz passenger car is one of the world's finest automobiles and that the Mercedes-Benz trademark, a three-pointed star in a circle, is recognized worldwide for its representation of automotive luxury, performance and technology.

The parts distribution system for Mercedes-Benz passenger cars is of central concern to the allegations before the court. Daimler-Benz assembles Mercedes-Benz autos in its German factory [1] and ships them through its exclusive importer Daimler-Benz of North America [DBNA] to MBNA for resale to Mercedes-Benz dealers. Parts for these autos can come from several sources:

1. DBAG manufactures certain parts for use in the assembly process and to be used for replacement of used parts;

2. Original parts may come from independent automotive parts manufacturers,

---

1. DBAG also manufactures trucks and other vehicles but this action concerns itself only with passenger cars and their replacement parts.

called "original equipment manufacturers" [OEMs]. Some of these OEMs manufacture parts for several automobile manufacturers.

3. Some automotive parts manufacturers produce parts only to be used as replacement parts rather than for use in the original assembly process. Such parts are known as "aftermarket" parts. Mercedes-Benz dealers are able to acquire replacement parts that are sold to MBNA by DBAG. These parts are either manufactured by DBAG or acquired by it from OEMs. Several OEMs distribute parts directly to MBNA with DBAG approval. Dealers can also acquire replacement parts directly from independent warehouse distributors who obtain the parts from various sources, including from DBAG's own suppliers.

There are approximately 400 Mercedes dealers in the United States. Once approved by MBNA, each dealer becomes party to a standardized written Dealer Agreement with MBNA to sell and service Mercedes passenger cars and parts. The Dealer Agreement remains in effect for a period of two years at which time it may be renewed.

The Dealer Agreement consists of three parts. The first, "Purposes of Agreement," sets forth general provisions relating to Daimler-Benz' continued commitment to maintaining its standard of excellence. The second part, "Standard Provisions," forms the heart of the agreement and contains twenty parts and sixty-five subparts relating to all phases of service, business operations, standards and Dealer Agreement procedures. Part three, "Dealer Operating Requirements Agreement," is concerned with display and personnel and is tailored to the capacity of each separate business.

The government rests its claim of a per se illegal tying arrangement on "Standard Provisions" subpart 9C of the Dealer Agreement.[2] Part 9 sets out various requirements relating to customer service. Subpart 9C reads:

> Dealer shall neither sell or offer to sell for use in connection with MB passenger cars nor use in the repair or servicing of MB passenger cars any parts other than genuine MB parts or parts expressly approved by DBAG if such parts are necessary to the mechanical operation of such MB passenger cars.

"MB parts" are defined in part one of the Dealer Agreement as "parts, accessories, components, assemblies, and optional equipment for MB passenger cars supplied by MBNA, DBAG, or by DBNA."

## II.

### THE APPLICABLE STANDARD

Defendant's Motion for Summary Judgment and opposition to plaintiff's motion are based largely on its argument that because of the nature of its franchise, per se tying standards are inapplicable and that a rule of reason is the appropriate standard for determining restraint of trade. However, the authority relied on by defendant does not support its position. In most of the cases cited, the franchise agreement between the parties did not contain express tying language, the procedural issues are distinguishable or the holding supports only the theory that Mercedes-Benz as franchisor may condition the sale of the passenger *car* on use of the Mercedes-Benz trademark.[3]

In *In re 7-Eleven Franchise Antitrust Litigation*, 16 Fed.R.Serv.2d 537 (N.D.Cal. 1972), plaintiffs were required in writing to purchase defendant's advertising, fixtures and bookkeeping services for a single payment measured as a percentage of gross

---

**2.** In its original Complaint, the government charged that the Dealer Agreement "as interpreted, applied, and communicated, require[s] the purchase of virtually all replacement parts from MBNA." Complaint ¶ 14(a).

**3.** Although defendant relies in part on *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct.

2047, 68 L.Ed.2d 349 (1981), that case deals primarily with the question of whether certain required business arrangements, including the lease of a company-owned store, were separate products from a McDonald's franchise, NOT whether a per se standard was appropriate. Thus this case is discussed *infra* in the 'separate products' section.

sales, as part of the 7-Eleven franchise. In ruling against class certification, the court expressed the opinion that the arrangement was not an illegal tie, characterizing the services as an integral part of an overall franchise package. It expressly relied on the absence of a requirement that plaintiff make any further purchase of products or services.

Defendant is not assisted by *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975). The *Grunin* court was called upon to review the lower court's acceptance of an antitrust class action settlement. By the terms of the agreement, plaintiffs were required to purchase pancake mix, coffee, furniture and services from the franchisor. The court expressly declined to decide whether this was an illegal tying arrangement but only ruled that the settlement terms were not invalid on their face because defendant might have a business justification for what appeared to be a per se illegal tie.

In *Kugler v. AAMCO Automatic Transmissions, Inc.*, 460 F.2d 1214 (8th Cir. 1972), plaintiff was required by written agreement to contribute to an AAMCO-selected publicity campaign as a requirement for obtaining an AAMCO transmission repair franchise. (Plaintiff also was required to purchase most repair parts from AAMCO but does not challenge that provision. However this provision was successfully challenged as a per se tying violation in *AAMCO Automatic Transmissions, Inc. v. Tayloe*, 407 F.Supp. 430 (E.D.Pa.1976)). Plaintiff argued that the prescribed advertising materials were separate products illegally tied to the right to use AAMCO's trade name. The court rejected this argument holding that advertising was an integral aspect of the operation of a transmission repair shop. *Id.* at 1215. In exchange

for plaintiff's initial franchise fees and a percent of gross receipts, AAMCO provided training in business management, sales techniques and transmission repair procedures. Unlike that of the present defendant, the AAMCO franchise represented primarily a method of providing a service through an integrated business system. The essence of the franchise was not to sell specific trademarked products. Additionally, the Mercedes-Benz Dealer Agreement also requires dealers to contribute to an advertising fund (Dealer Agreement ¶¶ G, H, I and J) but plaintiff does not challenge these provisions.

See also *Mid-America ICEE, Inc. v. John E. Mitchell Co.*, 1973–2 Trade Cas. (CCH) ¶ 74,681 (D.Or.1973).

■ Although restraint of trade tying arrangements have been considered by numerous courts, few have had to consider application of the various standards to the automotive industry. Defendant cites several such automotive cases including *Pick Manufacturing Co. v. General Motors Corp.*, 80 F.2d 641 (7th Cir. 1935), *aff'd per curiam*, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936), a case with a close factual situation.[4]

■ In *Pick*, plaintiff auto parts manufacturer brought suit under section 3 of the Clayton Act challenging GM's written dealer contract requiring that all replacement parts be manufactured or authorized by GM Company, a division of GM Corporation.[5] In upholding the lower court decision against plaintiff, the *Pick* court particularly relied on its findings that the contract provisions

> protect appellees in their warranties of automobiles and in their continued sale thereof with the intent to promote and preserve the good will of the purchasing

---

**4.** The court accepts that every trademarked automobile dealer is the franchised outlet for the automobile and replacement parts of their respective trademark franchisor. *See In re General Motors Corp.*, FTC Docket No. 9077 (1979) (Defendant's Exh. 3). However it does not necessarily follow that because an automobile manufacturer cannot be required to sell its parts to a non-franchised outlet that a fran-

chised outlet can be prohibited from selling non-franchised *parts*.

**5.** The standard for finding a § 3 Clayton Act violation is substantially the same as that for a § 1 Sherman Act claim. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir. 1977).

public, essential to business success; and that they do not and will not lessen competition substantially, within the meaning of the act, or tend to create a monopoly. *Id.* at 644. Although defendant cites the *Pick* case as support for its position that a per se standard is inappropriate, it must be noted that the law of tying has evolved substantially since 1935 and that the considerations relied on by that court are more properly construed as possible arguments for a business justification defense rather than as reasons mitigating against the application of a per se standard.

Defendant refers to *Miller Motors, Inc. v. Ford Motor Co.*, 252 F.2d 441 (4th Cir. 1958) as a case providing support for its position against the use of per se standards. However the court in that case was not presented with the question of whether to apply a per se or rule of reason standard to an allegedly express tying arrangement. The court found in *Miller Motors* that Ford dealers were required to participate in an advertising fund as a requirement for obtaining a Ford franchise. However this coercion was not evidenced by any uniform written agreement but rather was induced individually by representatives at the time of signing the dealer agreement.[6]

The court went on to hold that even assuming Ford Motor Co. was the moving force behind the coerced advertising agreements, the restraint of trade action would fail. Although the advertising scheme resulted in higher priced automobiles, this restraint was not considered unreasonable in light of the recognized purpose of advertising being to increase trade, not restrain it. The court noted the advantage to deal-ers of a single advertising program, that dealers were allowed substantial autonomy in their choice of advertising methods and that the restraint resulting from additional cost to the dealer of each automobile was incidental to the primary purpose of increasing competition. Therefore, the alleged combination did not have the objectionable features the Sherman Act was designed to prevent. *Id.* at 446.

■ In contrast, purchasing auto replacement parts only from a limited number of sources does not have as its primary purpose increasing competition for the franchised automobile. The direct result of such a requirement is to reduce the opportunity for Mercedes-Benz dealers in exercising their independent judgment in choosing parts to consider such factors as price and availability.[7] Restricting the source of dealer replacement parts may serve to increase the price of these parts and thereby restrain the dealers' ability to compete with independent distributors.[8]

Additionally, while the *Miller Motors* court found that Ford "was not using its economic position as an automobile manufacturer to invade and dominate the advertising business," *id.*, such interconnection is a dominant feature of the trademark/parts agreement between MBNA and its dealers. While the *Miller Motors* case raises important issues concerning the economic effects of the allegedly coerced advertising scheme, it does not help the court resolve the issue of when to apply a per se standard to tying arrangements.

Defendant cites *Susser v. Carvel Corp.*, 332 F.2d 505 (2d Cir. 1964), *cert. dismissed*,

---

6. As each new dealer signed an original sales agreement, he was presented with an LMDA [advertising fund] agreement. Only four Lincoln-Mercury dealers in the United States have not been members of some LMDA since 1950. The testimony showed that Ford representatives made it unmistakably clear that a dealer's franchise would be terminated if he resigned from LMDA.

*Miller Motors, Inc. v. Ford Motor Co.*, 252 F.2d 441, 445 (4th Cir. 1958).

7. Additionally, the opportunity is reduced for non-Mercedes-Benz parts distributors to com-pete with defendant for Mercedes-Benz dealer accounts.

8. On the other hand, restricting the sources of dealer replacement parts may serve to increase the competitive potential of the Mercedes-Benz automobile by contributing to its desirability as a high quality product. Such a finding, if one is to be made, must be based on a demonstrated connection between the parts restriction and the maintenance of otherwise unobtainable quality (discussed as a possible business justification, *infra*).

381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965) as support for its rule of reason theory. In that case, former and present individual operators of Carvel franchised ice-cream outlets brought an antitrust action against defendant alleging tying and exclusive dealing arrangements and refusal to deal. It must be noted from the outset that the plaintiffs stipulated in a pre-trial order that they would rely solely on documentary evidence and establish per se violations of the antitrust laws. *Id.* at 508. Therefore the court considered only whether a per se tying arrangement had been shown and denied plaintiffs' appeal after trial for failing to demonstrate defendant's sufficient economic power and because of defendant's demonstrated business justification for the tie. The court was satisfied with defendant's need to protect the uniform quality of its products and the impossibility of control through specifications and periodic quality inspections. Once again, the case stands more for the principle of possible business justification rather than any express rejection of a per se standard and is more appropriately discussed in that context.

Finally, defendant cites *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) to suggest the inapplicability of a per se standard. In that case the Court declined to apply a per se standard to a marketing plan whereby Sylvania franchised retailers were required to sell Sylvania products only from the location(s) set forth in the franchise agreement. The Court's reasoning was based on the specific nature of vertical territorial restric-

tions and their potential for promoting interbrand competition by increasing market efficiency even while decreasing certain intrabrand freedoms. *Within that context,* the Court determined that vertical restrictions were not shown to have a "pernicious effect on competition." *Id.* at 58, 97 S.Ct. at 2561. The Court concluded with a general statement that "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Id.* at 58–59, 97 S.Ct. at 2562.

While such language reflects general approval of a rule-of-reason analysis, the context of that case undermines defendant's argument that such a policy should be adopted in the present case. The *GTE Sylvania* decision substantially overruled *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), a case which itself only recently had departed from the rejection of a per se standard for vertical territorial restrictions found in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). By contrast, a per se rule long has been applied to tying arrangements because of "their pernicious effect on competition and lack of any redeeming virtue." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Defendant has not convinced the court that the *GTE Sylvania* holding should be extended to abrogate well-established antitrust principles pertaining to tying arrangements.[9]

---

9. The court notes the use of a rule of reason standard for an alleged tying arrangement in *State of New Jersey v. Lawn King,* 84 N.J. 179, 417 A.2d 1025 (1980). In that criminal prosecution, defendant owned a lawncare franchise consisting of machinery and products for use in servicing lawns. The dealership agreement required dealers to purchase supplies from defendant or from an approved source. The agreement included a detailed procedure to be followed for seeking approval of outside suppliers. In declining to apply a per se standard, the court relied on *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) and stressed the need to weigh and pro-competitive and anti-competi-

tive aspects of defendant's practices. The court emphasized that the franchisor's success was largely dependent on the quality of the franchisee's performance and that the business involved a novel commercial arrangement with which courts have had little experience. Also noted was the potentially severe consequences of a criminal prosecution. These factually distinguishable considerations undermine defendant's reliance on *Lawn King.* While that decision may anticipate a new direction in tying law, this court is unwilling to say that the exceptions to established per se tying principles have now become the rule.

At the same time, the court is not unconcerned with the potential for abuse, particular-

## III

## PER SE TYING STANDARD

The rule of per se restraint of trade has been applied in a number of diverse business settings under § 1 of the Sherman Act. The underlying principles are the same, however, that a presumption of an unreasonable competitive effect will be applied in certain situations without the necessity for prolonged inquiry into the complexities of a particular industry practice. *Northern Pacific Railway Co. v. United States, supra,* at 5, 78 S.Ct. at 518; *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 498, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969) [*Fortner I*]. Rules defining a per se violation have been applied to tying arrangements since *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

■ Essentially a tying arrangement exists where a seller with some market leverage over a (tying) product conditions the sale of that product on the purchaser also agreeing to buy a different (tied) product from the seller or foregoing such a purchase from any other source.

. . . Where [tying] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California, [et al] v. United States,* 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 606, 73 S.Ct. 872, 879, 97 L.Ed. 1277.

*Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 6, 78 S.Ct. at 518 (footnote omitted).

■ Plaintiff must demonstrate the existence of three elements to establish a per se illegal tying agreement:

1. Two separate products with the sale of one conditioned on the purchase of the other;

2. A seller with sufficient economic leverage in the tying market to appreciably restrain competition in the tied product market; and

3. A tie-in affecting a not insubstantial amount of interstate commerce.

*Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1212, 1216 (9th Cir. 1977); *Data General, supra,* at 1100.[10] Once the above elements have been shown, a defendant engaged in a per se tying arrangement may defend itself by an affirmative showing of business justification. *Id.* at 1101; *Moore v. Jas. H. Matthews & Co., supra,* at 1217.

ly on motion for summary judgment, with a mechanical application of a per se standard. Unquestioning extension of per se tying principles to diverse and complex market situations runs the risk of injecting legal short-hand into business practices not imbued with the anticompetitive characteristics the Sherman Act was designed to prevent.

Courts seem to recognize this dilemma. *E. g. Kentucky Fried Chicken v. Diversified Packaging,* 549 F.2d 368, 374–75 (5th Cir. 1977). However, rather than espousing wholesale rejection of a per se standard to tying arrangements, courts often reconcile this standard with business reality by finding that two products are not tied, that they are not separate products, or that a business justification exists for a tying arrangement. The principles are honored as much in the breach as in the execution and as a result courts as well as industries are left without consistent guidance. *See generally Anderson Foreign Motors v. New England Toyota Distrib., Inc.,* 475 F.Supp. 973, 981 (1979); Baker, "The Supreme Court and the Per Se Tying Rule: Cutting the Gordian Knot," 66 Va.L.Rev. 1235, 1310–19 (1980).

**10.** In *Moore v. Jas. H. Matthews & Co., supra,* the court also inquired into whether the seller of the tying product had an economic interest in the tied product. *Id.* at 1216. Defendant in the present case has a direct economic interest in the allegedly tied replacement parts and in many cases benefits from higher-than-average market price for the auto parts.

Such exceptions are few in number and narrowly construed.

### A. Separate Products Tied Together.

*Two Separate Products*

In its motion for summary judgment, plaintiff argues that the Mercedes-Benz automobile (tying product) and replacement parts for that vehicle (tied product) are separate products.[11] Defendant relies predominantly on authorities previously cited in which the court declined to find a tying arrangement.

Courts have considered several factors in determining whether two products are to be treated separately for purposes of a tying analysis. Separate products have been found when the products involved two separate markets. *Compare United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (installation of cable antenna tv system is a separate market from components of the antenna system) *with Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872 (1953) (advertising in separate morning and afternoon newspapers owned by single publisher is the same market). In the Ninth Circuit, the test for separate products has been expressed as the "function of the aggregation." *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). The *Siegel* court considered "whether the items are normally sold or used as a unit with fixed proportions." *Id.* (footnote omitted). In *Siegel*, franchisees challenged defendant's practice of conditioning the sale of its franchise and trademark on the purchase of a specified number of chickens and packaging supplies exclusively from Chicken Delight. Finding this to be a per se illegal tying arrangement, the court remanded only on the issue of damages. The *Siegel* court relied heavily on the type of franchise arrangement created by Chicken Delight. The franchise was established to conduct business under a trademark that reflects the goodwill and quality standards of its business rather than for the purpose of distributing trademarked goods. *Id.* at 49. The court accordingly found that the goodwill of the trademark attached to the *quality* of the product rather than to its source. Therefore the tie-in was unnecessary and the products distinct. *Id.*[12]

In applying the above standards, one court has considered whether the products at issue must come from the same seller, rather than whether they must be used together. *Data General, supra*, at 1104. That case involves the tying of computer hardware with software and memory devices. Defendant was requiring that purchasers of its central processing units (CPUs) purchase a minimum number of memory devices, that its software could only be used with its CPUs and that its software users must use a minimum number of memory devices. In finding the tying of separate products, the court looked to several factors: (1) That defendant sells some of its CPUs without requiring the purchase of software; (2) The existence of separate pricing schedules for the hardware

---

11. Initially, plaintiff complained that "the granting of a Mercedes-Benz franchise is conditioned upon the purchase by dealers of replacement parts solely from MBNA." (Complaint ¶ 13.) In the present motion, plaintiff considers the Mercedes-Benz automobile to be the tying product and not the franchise. Considering defendant's own authorities discussed in section II *supra*, the Court accepts the position that the Mercedes-Benz trademark and the Mercedes automobile are a single product. Thus the trademarked automobile may be considered the product tied to the sale of replacement parts.

12. In a footnote the court distinguished the packaged sale before it from a requirement to purchase "an automobile and its tires or a left shoe and the right." *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). Such an analogy does not vindicate defendant's position here. An automobile and its tires or the mechanical parts within it, are not in the same relationship as an automobile and its replacement parts. A new car must have tires to be operational; replacement parts by definition are necessary only after a fully operational automobile has aged or deteriorated.

and software; (3) That the marketing of the software and hardware were handled by different persons; and (4) That a number of companies manufacture only software or only CPUs, all to be used by or with the equipment from other manufacturers. *Id.* at 1104.[13]

In the present case, it is undisputed that MBNA has separate personnel and price lists for new car and replacement part sales. Many replacement (as well as original) parts are manufactured by outside suppliers.

Defendant relies on the authorities cited in Part I and particularly on *Principe v. McDonald's Corp.*, 631 F.2d 303 (4th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). In *Principe*, the court disagreed with the emphasis in *Siegel* that the trademark was the essence of the fast-food franchise. The question in *Principe* was whether a requirement that a licensee operate a McDonald's franchise on premises leased from the franchisor was an illegal tying arrangement. Although a franchisee must take a lease on McDonald's property and execute a security deposit note on unfavorable terms, the court declined to find an illegal tie-in. Rather, the court found that the lease and note were part of an overall franchise package that consisted, in addition, of sending potential franchisees to management school, placing them in outlet locations chosen after careful marketing research and consulting closely with each franchisee in all facets of the business.

Far from merely licensing franchisees to sell products under its trade name, a modern franchisor such as McDonald's offers its franchisees a complete method of

doing business ... Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie in exists as a matter of law. *Id.* at 309.

MBNA argues that the purchase of MBNA replacement parts is an "integral component" of its franchised business method. "The dealer exists for no purpose other than to distribute Mercedes-Benz products to the public." (Defendant's Reply Brief, at 13 ls. 23–24). Aside from the fact that Mercedes-Benz' reasoning would swallow the whole of antitrust tying principles,[14] the Mercedes-Benz facts are distinguishable from those in *Principe*. Importantly, the challenge in that case was not to a requirement that franchisees purchase equipment or food supplies from McDonald's. The court was dealing with a highly standardized and integrated business system for developing the capacity to provide the fast-food products. Part of that system involves McDonald's purchasing sites and building its own stores thus creating a substantial financial stake in the success of the restaurant. With the cost of a franchisee's initial investment minimized by McDonald's involvement, McDonald's is able to emphasize management skills and loyalty in those to whom it sells a franchise. These factors are important to a franchisor who, as in that case, "has built its reputation largely on the consistent quality of its operations rather than on the merits of its hamburgers." *Id.* at 310.

 In the present case, the business system of MBNA and the Mercedes-Benz dealers is not at issue.[15] There is no evi-

---

**13.** Other courts have considered (1) whether other members of the industry sell the products separately, (2) whether versions of the alleged single product differ in significant respects, (3) whether the customer is charged separately for the products, and (4) whether any components of the alleged single product are sold separately. *Anderson Foreign Motors, Inc. v. New Eng. Toyota Distrib., Inc., supra*, at 982 (1979) delineating the factors considered in *United States v. Jerrold Elecs. Corp.*, 187 F.Supp. 545 (E.D.

Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 6 L.Ed.2d 200 (1961).

**14.** It is the goal of every franchisor or seller of a trademarked product to distribute their products to the public. Following defendant's reasoning, MBNA could require its dealers to sell any product it decided to manufacture, whether or not that product was related to its trademarked automobiles.

**15.** Defendant does interject itself minimally into the business operations of its franchise

dence that MBNA has any monetary investment in its independent dealerships. The essence of the Mercedes-Benz franchise is the sale of trademarked automobiles. It is certainly true that an automobile is to a large extent the sum of its parts and that the function of a replacement part is the same as that of the part it replaces. However the court rejects defendant's argument that no difference may be noticed between original parts in a new automobile and parts purchased at a later date for repair or renewal for purposes of determining whether they are separate products. "... [T]he relevant inquiry is not whether the two items must be used together but whether they must come from the same seller." *Data General, supra,* at 1104 *citing Siegel v. Chicken Delight, Inc., supra,* at 49. While the use of DBAG-approved parts in the assembly of a Mercedes-Benz automobile is an important factor in producing the trademarked product, the use of trademarked Mercedes-Benz replacement parts is not necessary to carry out the essence of the franchise, that is, the sale of new Mercedes-Benz automobiles.[16] It is not disputed that Mercedes-Benz may require dealers to maintain a supply of parts and provide servicing to new automobiles as a legitimate means of assuring continued usability of its franchised product. To that extent the result in *Principe* may be applicable to the present situation. But there is nothing inherent in the Mercedes-Benz franchise or trademarked automobile that prevents future replacement parts from being provided by non-approved sources. There may be a

qualified business justification for such a requirement, but that inquiry involves considerations different from whether the Mercedes-Benz passenger car and its replacement parts are separate products.

■ In light of the foregoing discussion and in light of the actual practice of Mercedes-Benz and the industry in maintaining a separate parts division, separate prices, separate personnel and, occasionally, separate manufacturers, the court finds that the Mercedes-Benz passenger car and its replacement parts are indeed separate products.

*Products Tied Together*

In addition to a showing that two products are separate, it must be demonstrated that the purchase of one product is conditioned on the purchase of the other. Plaintiff relies on the express wording of the Dealer Agreement to demonstrate the tie-in. Defendant argues that the understood practice is that dealers are free to purchase non-Mercedes-Benz parts and that evidence of the parties' understanding should be controlling.

■ In *Northern Pacific,* the court rejected defendant's argument that the express tying conditions in a written agreement did not reflect actual practice. *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 11–12, 78 S.Ct. at 521–22. The existence of the language still acts as a powerful lever in restraint of trade.[17] Evidence of actual practice requir-

dealers. The "Dealer Operations Requirements" section of the Dealer Agreement addresses the issues of size of inventory and working capital, number of personnel, location of display signs, etc. Apparently specifications in these areas are developed by mutual agreement between MBNA and each dealer.

16. While defendant states that the purpose of the dealer's existence is "to distribute Mercedes-Benz products to the public," this characterization begs the question of whether the use of Mercedes-Benz products, other than those introduced in the new automobile itself, may be required in the Dealer Agreement.

17. Although there is evidence that some dealers bought non-Mercedes-Benz parts, the Deal-

er Agreement has a clause stating that failure to enforce the terms of the Agreement will not be considered a waiver of any terms. Therefore such evidence does little to diminish the coercive potential of the Agreement to the extent an express tie-in is demonstrated. Further, the alleged tie-in affects only parts mechanically necessary to the operation of the automobile. Dealers may well purchase other replacement parts or accessories from non-Mercedes distributors without diminishing this coercive potential with regard to mechanically necessary parts.

The court takes judicial notice of the ongoing settlement negotiations in *Technical Learning Collective, Inc. v. Daimler-Benz AG,* Civ. No. N–77–1443 (D.Md., preliminary approval

ing a tie-in is necessary only when the contract itself does not demonstrate a formal tying agreement. *See Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1224 (3d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

In its Complaint, plaintiff asserts that the alleged tie-in requires "virtually all replacement parts" to be purchased from MBNA. However the language of subpart 9C expressly refers to parts "necessary to the mechanical operation" of Mercedes-Benz cars. Therefore, only parts coming within that definition can possibly be tied by the terms of the Dealer Agreement. The evidence demonstrates that MBNA officers define this phrase expansively to include a substantial majority of the more than 20,-

000 parts in a Mercedes-Benz passenger car.[18]

■ Although the phrase 'necessary to the mechanical operation' is ambiguous, such ambiguity does not defeat the existence of tying language. To allow otherwise would result in defendant benefitting from its own imprecise drafting.[19] Additionally, there is credible evidence from defendant's own officers that this term has a common meaning in the automotive industry sufficient to put dealers on notice of the essence of the Dealer Agreement restrictions.

■ The wording of subpart 9C allows dealers to purchase parts "expressly approved by DBAG." An 'approved source' clause may negate a finding of an illegal tying arrangement. *See Photovest Corp. v.*

of settlement agreement Apr. 9, 1981), a class-action against DBAG and MBNA for various antitrust violations. The proposed Consent Decree includes a provision requiring MBNA to send a letter to each of its U. S. dealers advising them that each dealer is not contractually required to purchase parts solely from MBNA provided that the dealer does not represent to its customer, that parts purchased from sources other than MBNA were purchased from or approved by MBNA or DBAG or that either MBNA or DBAG assumes responsibility for the quality of such parts; such letter may also advise such dealer that MBNA and DBAG will not honor any warranty claim and will not assume responsibility or liability for claims arising from the use of parts not sold by them. Consent Decree, ¶ VII, at 4. A hearing to consider final approval of the Settlement Agreement is scheduled for June 19, 1981. While the sending of such a letter might defeat plaintiff's claim that the Dealer Agreement serves to tie purchase of replacement parts to the Mercedes automobile, *see Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721–22 (7th Cir. 1979), that issue is not presently before the court and cannot be allowed to divert this court's inquiry into the existence of a tying arrangement and the fashioning of an appropriate remedy.

**18.** The following excerpt is taken from the deposition of Heinz Waizenegger, Executive Vice-President of MBNA from 1975–1979:
Q. What is your understanding of that phrase ["necessary to the mechanical operation of such MB passenger cars"]? What does it mean to you?
A. I told you before, Mr. Dick, we have 29,000 different parts. It depends on the model, between 24 and 29,000 different parts

in one car, and if one is missing there's no operation.
Q. So all parts that MB supplies are necessary to the mechanical operation of the car?
A. Yes, sure, or some comfort items, of course—arm rest or something—the car would operate without arm rests, so there's some difference, of course.
Plaintiff's App. of Dep. Testimony, at 22.
According to other defendant deposition answers, the only parts not considered mechanically necessary are such parts as chrome molding and accessories (i. e. floor mat, trailer hitch). Some parts are considered necessary because a car would not operate properly without them (i. e. spark plugs) or are secondarily necessary for the proper operation of a larger part (i. e. oil filter). Plaintiff's App. of Dep. Testimony, at 94–95 (Horst W. Stoehr, Gen'l Manager Parts Division since 1975) and 329–30 (Josef Saje, Manager of Parts-Technical).
In *In re General Motors Corp.*, 34 FTC 58 (1941), the FTC drew a distinction between parts mechanically necessary to the operation of an automobile and those considered accessories or standard equipment not mechanically necessary. These latter parts included shock absorbers, safety glass, bumpers, and rear-view mirrors.
In *In re General Motors Corp.*, FTC Docket No. 9077 (1979) (alleged unfair trade practices in the distribution of new crash parts), the definition of crash parts includes bumpers, panels, doors and fenders. The court accepts that such parts also cannot be considered mechanically necessary.

**19.** Arguably, if a dealer knew exactly which replacement parts were included in subpart 9C, he or she would be less fettered in turning to outside suppliers for unrestricted parts.

*Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979); *Fast Food Fabricators v. McDonald's Corp.*, 1980–2 Trade Cas. (CCH) ¶ 63,552 (N.D.Cal. Aug. 26, 1980); *Smith v. Denny's Restaurants, Inc.*, 62 F.R.D. 459 (N.D.Cal.1974). However, in cases where an approved-source provision has defeated the existence of an illegal tie-in, there was evidence that a method for approval existed in fact. In *Denny's Restaurants*, the allegedly tied products were available only from approved suppliers but the franchise agreement provided for adding approved suppliers at the franchisee's option. The court held that a determination of whether unreasonable conditions were imposed on the exercise of that option would require individualized fact-finding and thus denied a motion for class certification.

The posture of the present case is distinguishable in significant respects. This is not a case where the allegedly tied product may be obtained only from an approved source; there is no express provision in the Dealer Agreement setting forth a procedure for dealers seeking to request additional approval.

In *Photovest Corp. v. Fotomat Corp.*, the court refused to find an illegal tying arrangement because of an approved source clause. "Given the contractual language,

which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest Corp. v. Fotomat Corp.*, supra, at 722.

In the present case, plaintiff has presented uncontroverted evidence that no formal system for approval of non-MBNA parts exists in the DBAG/MBNA network and that crucial MBNA officers are unaware of an established procedure for testing the quality of non-MBNA supplied parts upon dealer request for DBAG approval.[20] The evidence discloses that the approved source provision exists on paper only and does not represent a true alternative for dealers wishing to avoid the effects of a tie-in.[21] Defendant introduces no evidence suggesting a contrary interpretation but relies on its argument that once any extrinsic evidence is necessary for interpreting a written agreement, an allegation of per se illegal tying must fail.

However defendant erroneously concludes that allowing evidence on the meaning of terms in a written agreement automatically negates a finding of per se

**20.** The following exchange took place during the deposition of Heinz Waizenegger, MBNA's Vice-President, indicating that MBNA interprets the approved source clause strictly:

Q. Do you know if there's any way for a dealer to tell when a part has been expressly approved by DBAG or by MBNA?
A. The parts bought from us are packaged in Mercedes-Benz boxes with the Mercedes-Benz star and the logo and so on. This would be one way to say this is genuine Mercedes parts.
Q. Are any parts that are supplied to dealers by independent distributors parts that are expressly approved by DBAG or by MBNA?
A. They have their own ways to get such parts, yes.
Q. Would you explain what those ways would be?
A. I wouldn't know.
Q. If a dealer purchases a part from an independent distributor as opposed to MBNA, is there any way he can tell whether that part has been expressly approved by DBAG or by MBNA?

A. He should know that it has not been approved.
Plaintiff's App. of Dep. Testimony, at 21–22.
Compare with *Lawn King, supra*, in which a dealer agreement contained an approved source clause as well as a detailed procedure for seeking approval for use of outside suppliers.

**21.** The evidence suggests moreover that DBAG approval refers only to certain parts distributed by MBNA that have not gone through DBAG testing procedures. It does not appear that this "approved source" clause is meant to apply at all to dealers purchasing parts *from sources other than MBNA*. Defendant makes reference to warranty procedures whereby dealers may deal directly with a limited number of parts manufacturers who independently warrant their own parts (e. g. Bosch). But such contact is expressly limited to emergency situations and includes only those manufacturers whose parts DBAG has already approved for distribution by MBNA. (Defendant's Exh. 56).

illegal tying. Such a result is not supported by authorities. The narrow use of extrinsic evidence to assist in understanding the meaning of terms in a written agreement is not inconsistent with the principles behind the use of per se standards in antitrust law. *See Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 977–79 (1979). What is meant to be avoided by the use of per se standards is the need to explore extensive dealings between parties to determine the existence of anticompetitive effects on trade.

■ For the foregoing reasons, the court finds that the Mercedes-Benz passenger car and its replacement parts are separate products tied together by the use of the MBNA Dealer Agreement.

## B. Sufficient Economic Power.

■ The second factor in determining a per se illegal tying agreement is that the seller must have "sufficient economic power to impose an appreciable restraint on free competition in the tied product ...." *Northern Pacific Railway Co. v. United States, supra*, 356 U.S. at 11, 78 S.Ct. at 521. This standard can be met in one of three ways:

1. The seller occupies a dominant position in the tying product market, *Data General, supra;*

2. A product is sufficiently unique that the seller has some advantage not shared by competitors in the market for the tying product, *Moore v. Jas. H. Matthews & Co., supra; Fortner I, supra;* [22] or

3. A substantial number of customers have accepted the tie-in and there are no explanations other than the seller's economic power for their willingness to do so.

*United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) [*Fortner II*]; *Data General, supra.* Plaintiff argues that the second and third factors are met in this case; it does not rely on a showing of MBNA's dominant market position.

Looking at the third factor first, plaintiff argues that this standard is easily met because each of 400 Mercedes-Benz dealers has signed the Dealer Agreement agreeing to buy replacement parts from MBNA under subpart 9C. Defendant argues that the acceptance by dealers of the alleged tie-in is not a coerced result of economic leverage but rather an independent decision to accept what they consider to be a superior product.

Courts have recognized that a showing of an appreciable number of buyers accepting a tie-in does not necessarily reflect coercion based on economic power and have allowed defendants to offer other explanations. For instance, in *Fortner II, supra*, the Court accepted the rationale that defendant's practice of extending below-market credit terms only to purchasers of its prefabricated homes, was a legitimate substitute for a reduction in the price of the allegedly tied product. *Id.* 429 U.S. at 620–22, 97 S.Ct. at 867–69.

■ However, such rationale is not available to and has not been argued by defendant. The court questions whether a dealers' belief in the quality of the product is sufficient to dispel the assumption of economic leverage. To allow such explanation would circumvent established principles that an otherwise per se tying violation is no less so because of the purchasers' preference for the allegedly tied product.[23] But

**22.** Although this circuit has required a showing of "some modicum of coercion" as part of this second factor, *Moore v. Jas. H. Matthews & Co., supra*, at 1216, the court agrees with a substantial number of other courts having ruled on the issue that this element is properly presumed from a finding of sufficient economic power and the existence of separate products tied together. *See, e. g., Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977) (individual proof of coercion not required if tying claim

based on express provisions of a uniform contract); *In re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1101 n.11 (N.D.Cal. 1980); *Anderson Foreign Motors, Inc. v. New Eng. Toyota Distrib., Inc., supra*, at 988–89.

**23.** If plaintiff meant to demonstrate that a substantial number of Mercedes-Benz dealers signed the Dealer Agreement unwillingly, then defendant would be permitted to demonstrate the dealers' willing acceptance of the replace-

that question need not be resolved at this time.

It appears that plaintiff means to establish this third test for economic power by relying on the fact that all 400 Mercedes-Benz dealers have signed the Dealer Agreement and on the high prices of many Mercedes-Benz replacement parts. The undisputed evidence is that dealers and the Mercedes-Benz organization itself were concerned that defendant's prices for many replacement parts were consistently higher than parts from other sources. (Plaintiff's Exh. 21, 250, 253, 24, 30). This evidence lends support to the argument that any alleged tie-in would be unwelcome to buyers in a price-competitive market.

■ However the court is concerned that using "an appreciable number of buyers" standard in the present case is an improper application of the underlying principles. See AAMCO Automatic Transmissions, Inc. v. Tayloe, 407 F.Supp. 430, 436 (E.D.Pa.1976). Plaintiff has made no attempt to demonstrate a logical relationship between the number of customers accepting the Mercedes-Benz tying terms and the existence of defendant's economic power. A determination that "an appreciable number of buyers" have accepted a tie has little meaning beyond demonstrating the size of defendant's business unless it is apparent that some buyers in a class have the choice NOT to accept the tied terms. Plaintiff apparently defines the universe of potential buyers as all Mercedes-Benz dealers and then relies on the fact that 100% of them have accepted a tie by signing the Dealer Agreement. However the simple reality is that if they had not signed the Agreement, they would not be Mercedes-Benz dealers.

In Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), the court determined that an appreciable number of customers had accepted a tied package. Approximately 25% of SCM business machine owners or lessees had also

entered into a service maintenance contract that allowed defendant to suspend service as to those customers using non-SCM paper supplies in their machines. Id. at 69. In that situation, the number of customers accepting the package represented a portion of a larger identified market population, that is, all owners and lessees of SCM business machines in the Baltimore area.

In the present case, there is no identified population against which to compare the 400 Mercedes dealers. Plaintiff might argue that 400 represents an appreciable number of buyers from a total population of import car dealers or of import luxury car dealers. Plaintiff has not attempted such a showing.

■ The essence of any showing under this test is that defendant has leverage within the market sufficient to compel buyers to accept a tying arrangement. If plaintiff is able to show that a significant number of customers in the market have accepted the tie-in, it still must show that there are no explanations for the acceptance other than the seller's economic power. Plaintiff has failed on each of these counts. Use of a tie-in may be explained not as a result of economic leverage but as a result of dealer or customer preference, lack of any overall price disadvantage, custom of the trade or other reasons.[24] While there are suggestions in the record as to some of these explanations or their absence, there is insufficient uncontroverted evidence to support summary judgment.

■ Alternatively, plaintiff may satisfy the second factor, sufficient economic power, if it can show that the alleged tying product, the Mercedes-Benz automobile, is sufficiently unique to give defendant a competitive advantage in the tying product market. If the tying product is sufficiently desirable to consumers or is a product not easily replicated or commonly available, then the producer of the tying product is

---

ment part terms as rebuttal. However plaintiff does not attempt to demonstrate economic power by such a showing.

24. These explanations in some respects overlap the business justifications asserted as a defense since the dealers' considerations may in some respects parallel those of the manufacturers.

likely to have sufficient leverage to restrain the tied product market. *See Moore v. Jas H. Matthews & Co., supra,* at 1215; *United States v. Loew's, Inc.,* 371 U.S. 38, 46, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962).[25]

In *Northern Pacific,* the tying product consisted of extensive landholdings particularly desirable because of their location near transportation facilities. In exchange for acquiring land essential to their business activities, purchasers gave up their freedom to deal with competing carriers. *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 7–8, 78 S.Ct. at 519. The Court determined that by virtue of the size and location of the landholdings, plaintiff had sufficient leverage to exclude competitors.

 Adopting plaintiff's characterization of the uniqueness issue, the facts in the present case do not fall within the "patent-copyright" line of cases holding that sufficient market leverage is presumed when the seller holds a patent or copyright on the tying product. *See, e. g., United States v. Loew's, Inc., supra,* 371 U.S. at 45–46, 83 S.Ct. at 102. Nor do the present facts bring Mercedes within the holdings of the "franchise" cases conferring sufficient economic power on the franchisor by virtue of its trademark control over a common product. *See, e. g., Siegel v. Chicken Delight, Inc., supra.*

The Mercedes-Benz franchise confers on dealers the right to sell the Mercedes-Benz passenger car, a product of well-known quality and appeal. Defendant argues that its product is unique only if it cannot be duplicated by anyone else, thereby conferring a monopoly on the manufacturer. It further points out that because other auto manufacturers have the capability to produce a car of comparable quality, Daimler-Benz has no special advantage over other auto manufacturers and should not be penalized for developing a superior product.

 While defendant's argument has appeal, it is based on application of erroneous principles. Monopoly power is not the test for uniqueness and defendant's own authorities show themselves distinguishable. *E. g., United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (consideration of monopoly power under § 2 of the Sherman Act). At the same time, ownership of a trademark is not conclusive of economic power. In some circumstances, the Ninth Circuit permits a presumption of economic power based on trademark protection. *Siegel v. Chicken Delight, Inc., supra.* However applying that presumption to the type of franchise at issue here is a significant extension this court is unwilling to make.

One court, while recognizing the problem of basing economic power on something as common as a trademark, determined that the combination of a trademark with nationwide preeminence in a retail market was sufficient economic power as a matter of law. *Krehl v. Baskin-Robbins Ice Cream Co.,* 78 F.R.D. 108 (C.D.Cal.1978).[26] However in *Krehl,* the issue before the court was class certification and defendant was the operator of the nation's largest chain of ice cream stores, neither of which applies to the present facts.

In *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir. 1972), the court found a trademark to be "persuasive evidence of significant market leverage in the hands of Copeland." *Id.* at 1015. Defendant was one of the nation's leading manufacturers of new and rebuilt compressors for refrigeration and air conditioning equipment. By written agreement,

---

25. "Whenever there are some buyers who find a seller's product uniquely attractive, and are therefore willing to pay a premium above the price of its nearest substitute, the seller has the opportunity to impose a tie to some other good." Note, The Logic of Foreclosure: Tie-In Doctrine after *Fortner v. U. S. Steel,* 79 Yale L.J. 86, 93–94 (1969).

*United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 621 n.14, 97 S.Ct. 861, 868 n.14, 51 L.Ed.2d 80 (1977) [*Fortner II*].

26. The outcome of the decision was later reversed but on grounds not relevant to the issue of economic power. *See Krehl v. Baskin-Robbins Ice Cream Co.,* 1979–2 Trade Cas. (CCH) ¶ 62,806 (C.D.Cal.1973).

defendant prevented its franchised wholesalers from dealing in compressors rebuilt by non-authorized rebuilders and barred its franchised rebuilders from obtaining parts from non-Copeland services as a condition of using defendant's trademark.

■ In the present case, Mercedes-Benz' trademark may be a factor in determining its market leverage, but alone, it is not sufficient. While Mercedes-Benz may be well-known and its products highly respected, it is not one of the industry's largest competitors. Plaintiff has failed to support its claim of uniqueness with information bearing on market characteristics. *See Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 452 (9th Cir. 1979). For instance, does plaintiff argue that Mercedes-Benz is an automobile unique as to other luxury cars or to other imported cars? If Mercedes is a unique automobile, would not every trademarked auto also be unique? Or all luxury/import cars? Plaintiff relies heavily on defendant's own characterization of its automobiles (i. e. "engineered like no other car in the world"). While self-laudatory slogans in advertising may demonstrate defendant's aspirations and preferred image, they cannot be relied upon to determine uniqueness as a matter of law.

■ A finding of economic power based on uniqueness of a tying product is one that must be based largely on objective market factors and partially on subjective impression. Such a result cannot be determined in the present action as a matter of law.

The court finds that there is substantial factual dispute on the question of sufficient economic power and declines to resolve the matter on summary judgment.

## C. Effect on Interstate Commerce.

■ The third required element of a per se tying violation is that the tie-in affect a not insubstantial amount of interstate commerce. The 'not insubstantial' test is interpreted broadly. "[T]he controlling consideration is 'whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis* is foreclosed to competitors'. *Fortner I, supra*, 394 U.S. at 501, 89 S.Ct. at 1258". *Moore v. Jas. H. Matthews & Co., supra*, at 1216.

■ From 1974 through 1979, the total dollar volume of MBNA replacement part sales to dealers increased from $50 million to $110 million. (Plaintiff's Exh. 4, Defendant's Response to Interrogatory No. 3). These figures include sales of warranty parts and parts later returned to MBNA for credit. Defendant argues that plaintiff must show which "unwanted" parts in interstate commerce were "forced" upon unwilling dealers. But defendant gives no authority for such an interpretation and the court is unpersuaded. A determination of amount of commerce affected is based on the volume of sales *allegedly* foreclosed. *Fortner I, supra*, 394 U.S. at 501–02, 89 S.Ct. at 1258. It is not a requirement of this third element to demonstrate actual foreclosure.

■ While defendant may legitimately argue that dollar volume of tied sales should not include warranty and credit parts,[27] it has offered no evidence to show that elimination of these parts would reduce its total sales figure by any substantial amount. Of course sales allegedly foreclosed in the present case can refer only to parts mechanically necessary to the operation of the Mercedes-Benz passenger car. Sales of crash parts and accessories likewise should be subtracted from gross sales. However even with the above reductions there is no evidence that the remaining volume is so small as to be *de minimis*.[28]

27. Plaintiff has stated to the court that its Complaint does not extend to parts sold or used for warranty repairs (Defendant's Brief In Support Of Its Motion for Summary Judgment, at 13).

28. Defendant submits the Initial Decision in *In re General Motors Corp.*, FTC Docket No. 9077 (1979) to demonstrate that crash parts comprise a large share of a dealer's service and repair parts business. While it may be true that GM crash part sales in 1972 exceeded $250 million, that does not help the court determine the extent of MBNA's market for mechanically necessary replacement parts.

Therefore the court finds that the volume sales of mechanically necessary replacement parts to be not insubstantial and that as a matter of law, plaintiff has satisfied this third requirement.

It has thus far been established that per se tying principles are applicable to the present action. The court has found, as a matter of law, that (1) the Mercedes-Benz automobile and MBNA replacement parts are separate products tied together by language in the Dealer Agreement, and (2) the tie-in affects a not insubstantial amount of interstate commerce. However a per se illegal tying violation is not shown unless plaintiff prevails at trial on the issue of defendant's economic power.

## IV.

## BUSINESS JUSTIFICATION

In certain circumstances, defendant may demonstrate a business justification to excuse an otherwise per se illegal tying agreement. *Data General, supra; Moore v. Jas. H. Matthews & Co., supra; Siegel v. Chicken Delight, Inc., supra*. In the Ninth Circuit, "... the defendant bears the burden of proving that his case fits within the narrow contours of the business justification defense." *Data General, supra*, at 1101 n.12 (cites omitted).

Defendant repeatedly asserts as its justification that the use of MBNA replacement parts is essential to the continued high quality and reputation of its cars and the Mercedes-Benz trademark. Use of unauthorized parts, it argues, will lead to customer dissatisfaction and dangerous safety problems for which MBNA is potentially liable.

 The first argument is essentially that of 'goodwill', that the reputation of MBNA will be injured if Mercedes-Benz

drivers receive inferior non-Mercedes-Benz replacement parts yet associate any resulting mechanical problems and failures with MBNA itself. This argument is rarely sufficient to support a business justification exception. *Data General, supra; Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). "If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway." *Id.* at 306, 69 S.Ct. at 1058. In *Standard Oil Co.*, the Court held that a good-will defense may be legitimate only when "specifications for a substitute would be so detailed that they could not practicably be supplied." *Id.*

In *Susser v. Carvel, Corp., supra*, plaintiff franchisee was required to purchase Carvel ice cream as a requirement for obtaining the franchise. In upholding a finding of business justification, the court distinguished the facts of that case. "Although instances of impossibility of control through specification may indeed be rare in cases involving the proper functioning of mechanical elements of a machine [cites], such cases are scarcely relevant to the problem of controlling something so insusceptible of precise verbalization as the desired texture and taste of an ice cream cone or sundae; ..." *Id.* at 520 (concurring opinion).[29]

MBNA argues that it is impractical if not impossible to publish "engineering, manufacturing, and testing procedures for over 25,000 separate parts" and expect dealers to have the technical competence or testing equipment necessary to determine whether the specifications have been met. Phrased in those terms it is certainly a substantial burden to inflict on defendant corporation and dealers.[30] However, the practicalities may be cast in a different light.

**29.** The reasoning in *Susser v. Carvel, Corp.*, 332 F.2d 505 (2d Cir. 1964), *cert. dismissed*, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965), has been subject to question. *See, e. g.,* McCarthy, "Trademark Franchising and Antitrust: The Trouble With Tie-Ins," 58 Calif.L. Rev. 1085 (1970).

**30.** There is some evidence contrary to even this conclusion however. In its own Reply Memorandum in support of its Motion for Summary Judgment, defendant cites the deposition testimony of a dealer that certain non-Mercedes-Benz parts did not comply with Mercedes' specifications. (Testimony of Mr. Laskeris,

The record discloses that Daimler-Benz has already developed specifications for many of its replacement parts manufactured by other companies. The critical question then, is not whether specifications could be drawn but rather whether the quality-control inspection conducted by DBAG could be replicated elsewhere and whether that inspection per se provides significant additional assurance of quality to justify the alleged tie-in. Further, the focus is not properly on whether dealers themselves have the capacity to carry out inspections but whether alternative quality control procedures can be established between DBAG and other parts manufacturers to provide comparable assurances of quality.

MBNA purchases roughly 80% of its replacement parts from Daimler-Benz, half of which are manufactured by DBAG, half are acquired by DBAG from other auto parts manufacturers.[31] Each chosen parts manufacturer is provided DBAG specifications for the parts they are to manufacture. In addition they are instructed on testing and inspection procedures that must be installed in their own plant. Each shipment of parts coming to DBAG therefore, has already passed through one round of inspection.

MBNA provides a description of DBAG quality-control testing procedures and facilities used by it for a second round of tests. From every lot of parts shipped to Daimler-Benz, a "selected number" are taken for inspection. A variety of visual, micrometric, x-ray and bench tests are employed. If any of the test parts are deficient, the whole lot is rejected.

From this evidence it is undisputed that DBAG has developed elaborate and rigorous

inspection procedures. The court is unable to determine from the record however whether these procedures play a significant role in maintaining Mercedes-Benz' overall standards of engineering excellence.[32] For instance, defendant has not introduced evidence on whether its tests result in a significant number of shipments being returned to manufacturers because of defects. It may be that although the methods are elaborate, the actual result in terms of assured quality is minimal. It is apparent also that in spite of strict standards, occasional defective shipments are not detected. Additionally, there is nothing in the record that specifically addresses whether comparable engineering standards might not be maintained by a system of checks on the testing facilities of the non-Mercedes-Benz parts manufacturers.

Defendant additionally argues that a tying requirement is necessary in light of the modern trend to expand products liability and to increasingly hold manufacturers responsible for defective products. Although the issue of warranty repairs is not before the court, defendant still faces the serious problem of potential liability for the failure of defective or improperly designed replacement parts. The issue before the court is narrowed to whether defendant is justified in requiring the purchase of only mechanically necessary "MB parts" for replacement after the warranty period.

In *Susser v. Carvel*, the court was persuaded that potential liability for a defective product was a legitimate justification for a tie-in even where certain products were purchased from other suppliers. The court concluded that "the difficulties of

---

Deposition App. I, at 41–43, 49, 50 cited in Defendant's Reply Brief, at 34).

**31.** The following facts are taken from the Declaration of Horst W. Stoehr, General Manager of MBNA Parts Division since July 1, 1975.

**32.** Certain replacement parts already do not receive the benefit of DBAG's second-level inspection. Twenty percent of MBNA purchased parts do not come from DBAG but are purchased directly from other auto parts manufacturers who have met DBAG's standards for the

quality of their parts and inspection procedures. (Declaration of Horst Stoehr, Plaintiff's App. of Dep. Testimony, at 43–44.) Each of these manufacturers warranty their parts directly to the customer. A number of these non-DBAG parts are independent units, such as a radio or air-conditioning system, that do not affect the overall operation of the car. But other approved non-DBAG parts are integrated components, i. e., spark plugs or fuel injection and electrical system components from Bosch Mfg. *See id.* at 44–45.

proof are such that [Carvel] is entitled to insist on products in which it has complete confidence." *Susser v. Carvel Corp., supra,* at 520 (concurring opinion).

Defendant presents a cogent argument for distinguishing the distribution, servicing and repair of automobiles from other consumer products. The automobile is unquestionably a technically sophisticated and potentially dangerous machine.[33] Also distinguishing the automotive industry is the degree of legislative concern over honesty and fair dealing with the automotive public.[34]

In an instructive automotive industry case concerned in part with the tie of replacement parts, the Federal Trade Commission entered a cease and desist order addressing section 3 violations of the Clayton Act. *In re General Motors Corp. and General Motors Sales Corp.,* 34 F.T.C. 58 (1941). The FTC found that GM had coerced its dealers, in part by written terms in the Dealer Agreement, to purchase only "genuine" GM accessory and replacement parts (made by GM or their approved manufacturers). Defendants were ordered to refrain from

> [e]ntering into, enforcing, or continuing in operation or effect, any franchise or agreement for the sale of automobiles, or any contract for the sale of, or selling, automobile parts in connection with contracts or franchises or selling agreements with automobile retail dealers for the sale of new automobiles on the condition, agreement, or understanding that the purchasers thereof shall not use or sell

automobile parts other than those acquired from the respondents, *unless such condition, agreement, or understanding be limited to automobile parts necessary to the mechanical operation of an automobile, and which are not available, in like quality and design, from other sources of supply.*

*Id.* at 86 [emphasis added]. The wording of the order suggests a resolution to the conflicting interests presently before the court. The government and the public has a legitimate interest in encouraging unrestrained trade in automotive parts, yet defendant has an important legitimate interest in protecting its trademarked automobile and public confidence in the quality and safety of the product.[35] If parts of like quality and design are available from other sources of supply, defendant's sole justification for requiring a tie-in becomes the impermissible desire to restrict trade and maintain artificially inflated prices.

■ At this time, the court is unable to make a finding regarding defendant's business justification defense. If plaintiff is able to establish the final element of a per se tying violation, it remains for defendant to demonstrate the necessity for its quality control procedures and the unavailability of comparable mechanically necessary replacement parts from non-MBNA sources.

## V.

## CONCLUSION.

Based on the foregoing discussion, the court finds a genuine dispute of material

---

33. Illustrative of this concern is a statute of the California Vehicle Code added in 1975: "Any person who sells and installs new parts in passenger cars, in the ordinary course of his business, shall provide the customer with an invoice which identifies by brand name, or other comparable designation, the part or parts installed." Cal.Veh.Code § 12001(a) (West Supp. 1980). While such a requirement should minimize the proof problems for a defective product, it has not eliminated them.

34. Defendant cites *Pick Mfg. Co. v. General Motors Corp.,* 80 F.2d 641 (7th Cir. 1935) as support for this argument. While that court recognized the advanced technology and potentially dangerous consequences of automotive engineering, one of the few authorities relied on

by that court expressed a similar concern for delicate construction of and customer satisfaction with shoe manufacturing machinery. *United States v. United Shoe Mach. Corp.,* 264 F. 138, 167, *aff'd,* 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). Yet such machines hardly present the same potential for harm as does a defective automobile part. Additionally, the outcome in *United Shoe* is likely to be different today. *See, e. g., Data General, supra.*

35. In *Susser v. Carvel Corp., supra,* the court found that "[s]ince the value of a trade-mark depends solely on the public image it conveys, its holder must exercise controls to assure himself that the mark is not shown in a derogatory light." *Id.* at 519.

fact within plaintiff's motion for summary judgment and its motion is HEREBY DENIED. In accord with this court's determination that a per se standard is applicable to MBNA's alleged tying violation, defendant's cross-motion for summary judgment is also HEREBY DENIED.

Pursuant to F.R.Civ.P. 54(d), the court finds that the following material facts exist without substantial controversy:

1. The Mercedes-Benz automobile and MBNA mechanically necessary replacement parts are separate products tied together by the terms of the MBNA Dealer Agreement; and

2. The tie-in affects a not insubstantial amount of interstate commerce.

Genuine controversy exists as to:

1. Whether MBNA has sufficient economic leverage in the tying product market to appreciably restrain competition in the tied product market; and

2. Whether MBNA has demonstrated a legitimate business justification for tying the sale of its replacement parts to that of its trademarked automobile.

IT IS SO ORDERED.