GRAPPONE, INC.

v.

SUBARU OF NEW ENGLAND, INC.

Civ. No. 74–119–D.

United States District Court,
D. New Hampshire.

March 15, 1982.

Howard B. Myers, Concord, N.H., John F. Graybeal, Washington, D. C., for plaintiff.

John W. Barto, Concord, N. H., Harold E. Magnuson, Boston, Mass., for defendant.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

Named for a constellation,[1] and manufactured in Japan, the Subaru automobile came to the American scene in the early 1970's. The genesis of this private antitrust litigation is a marked personality clash between two strong-willed members of its New England distributor chain.

Fuji Heavy Industries, Ltd. ("Fuji"), manufactures the Subaru and its necessary parts. Subaru of America ("SOA"), a Pennsylvania corporation, is the sole importer of the vehicle into the United States.[2] SOA purchases Subarus from Fuji FOB Japan and ships them to various United States ports of entry, from whence they are resold to a network of fifteen regional distributors.[3] These distributors in turn resell the vehicles to a network of dealers by them recruited.

Plaintiff Grappone, Inc. ("Grappone"), a New Hampshire corporation, is the Subaru retail dealer in the Concord, New Hampshire, area. Defendant Subaru of New England, Inc. ("SNE"), a Massachusetts corporation, is the regional distributor for the New England area.[4] SNE is the successor to an earlier Connecticut-based distributor, and it has been the New England distributor since January of 1971. Grappone procured its original Subaru franchise from SNE on April 12, 1971.

SNE receives its Subarus through the port of Boston, from whence they are transshipped to its dealers throughout New England. Grappone sells, services, and repairs Subarus from its "North End" facilities situate at 167 North State Street in Concord.[5] At said location, it also markets AMC, Pontiac, and Jeep vehicles, while simultaneously marketing Toyotas and Peugeots from a site on Route 3A in Bow, New Hampshire. Members of the Grappone family also operate retail automobile franchises for the sale of Ford, Honda, and Mazda motor vehicles.

At all times pertinent to this litigation, James Grappone had been the principal of and made the major business decisions for Grappone. His counterpart at SNE has been one Ernest Boch.[6]

When SNE took over the New England Subaru distributorship in June of 1971, Edwin Burtnette, an employee of the previous distributor, became an employee of SNE. In 1972 Boch and Burtnette disagreed as to the latter's continuing role with SNE, and Burtnette then left SNE for employment with Grappone.[7]

1. In the Japanese language, "Subaru" is the term for "Pleiades", Plaintiff's Exhibit 96, in turn the designation of a group of stars in the constellation Taurus.

2. SOA was formed in 1968 by a group of Americans who sought successfully, on their own initiative, an exclusive contract from Fuji by which to import and market Subarus in the United States.

3. With a single exception (that being the Southern California-Nevada distributor), SOA has no ownership interest in any wholesale or retail marketer of Subaru.

4. The term "New England area" is used in its classic definition, i.e., the six states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, and Connecticut.

5. From June 1, 1972, to mid-July 1972, Grappone marketed Subarus from a building situate on Route 3A in Bow, New Hampshire. It has also made isolated sales of Subarus from its Toyota facility at the same location.

6. As with the Grappone family, Boch also marketed more than one make of automobile, e.g., AMC, Jeep, Oldsmobile, and Toyota.

7. Burtnette had earlier met James Grappone at an automobile dealers meeting in Nevada. Burtnette was employed with Grappone from December 1972 to April 1, 1974, leaving on the latter date for employment elsewhere.

The complaints of the plaintiff Grappone in this litigation focus on dual issues:[8] (1) the requirement of SNE that its dealers purchase a "parts kit" for use with the 1974 model Subarus and (2) the requirement of SNE that its dealers participate in a certain advertising program. For ease of analysis, we discuss these issues seriatim.

### I. The "Parts Kit" Issue

Basic to the successful marketing of automobiles is the availability of a sufficient supply of parts from which necessary replacements and repairs can be made. The sales of imported vehicles have suffered in the past when such parts have not been available.[9]

Accordingly, when Burtnette was vice president of SNE, he ordered the New England dealers to pay in advance for parts kits he deemed necessary to service the 1972 Subaru models. Plaintiff's Exhibit 19. In the spring of 1973, however, Grappone complained that SNE had been unable to furnish it with a sufficient supply of parts to meet its needs. Defendant's Exhibits C and D.[10] Dissatisfied with the unavailability of parts and what they perceived to be unfair actions on the part of Boch, the New England Subaru dealers met in Concord, New Hampshire, on June 12, 1973, and formed a Dealers Council, of which Burtnette was elected secretary-treasurer. Boch attended this meeting and engaged in dialogue with the dealers as to their varied complaints, among which were the availability of and return of parts.

SOA was not unaware of the problem involved in procuring an adequate supply of parts for its distributor chain. Having been told by Fuji that the 1974 model Subaru would differ substantially from earlier models, SOA set about to insure that parts for that vehicle would be available in adequate supply. In early July 1973, it dispatched its national warehouse manager, Robert Hightower, to Japan to review the availability of parts for the 1974 Subarus. As Fuji was unable to furnish SOA with advance information, Hightower reviewed the sales records and parts catalogue then available to him.[11]

On his arrival in Japan, Hightower learned that Fuji did not have available a complete 1974 parts list for his review. From his review of earlier sales records, Hightower judged that if a given part had sales of at least twenty in number, such part should be included in all four (dealer, distributor, supplemental, and importer) parts kits to be prepared. If the sales record was ten items or less, the part was to be included only in the kits to be furnished the importer and distributor. At five or less sales, the part was to be included only in the kit furnished the importer.

Working with blueprints furnished by Fuji and a Japanese translator, Hightower determined that 700 of the 4000 to 5000 parts in each 1974 Subaru must necessarily be reviewed for inclusion in the parts kits. Subsequently, he determined that 625 of such parts would be included in the importer kits, 528 of such parts would be included in the distributor kits, and 88 of such parts would be included in the kits to be furnished each dealer. The supplemental kit was to include 44 parts which were deemed

**8.** For previous disposition of other claims originally advanced by plaintiff herein, see *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123 (D.N.H.1975) (Bownes, J.).

**9.** Robert Lee, principal of Subaru's oldest American regional distributor, testified without objection that Renault established early sales of 100,000 vehicles per year in the 1960's, but due to failure of its parts supply its annual sales had dropped to 5000 to 6000 by 1977.

**10.** Defendant's Exhibits C and D are letters from Burtnette (in his then position as vice president of Grappone) to SNE complaining of Grappone's low inventory of parts and SNE's

inability to supply such. Dated, respectively, April 23 and May 31 of 1973, these documents bear attached listings of "back ordered" parts allegedly not received, and in each instance SOA has been copied with reference to these complaints.

**11.** SOA had previously furnished parts kits to its dealers for earlier models, and in preparation for his trip Hightower reviewed the sales records and parts catalog used by SOA in its warehouse in Pennsauken, New Jersey. This warehouse sold the majority (60%) of Subaru parts throughout the United States.

necessary for immediate repairs, as in some instances there was a need to repair damage which had occurred in shipment from Japan to the United States.

In addition to the parts for the 1974 Subaru models, Hightower also determined that approximately four parts for late (or stage three) 1973 models (which had been shipped to the United States in the late spring of 1973) should be included in the parts kits. As Fuji required lead time of approximately 120 days to manufacture the necessary parts, Hightower, prior to leaving Japan, placed an initial order for two importer kits, twelve distributor kits, and 250 dealer kits.

Upon his return to New Jersey in mid-July, Hightower conferred and reviewed his work with Robert Brodeur, the recently-hired national parts manager for SOA. On July 25, 1973, Brodeur dispatched to each of his distributors a letter to which was attached the list of parts necessary for distributor, dealer, and supplemental kits. Defendant's Exhibit MM. The distributors were instructed in said letter to review the attached lists as soon as possible so that they might in turn make up their own orders and transmit same to Fuji as soon as possible.

Upon receipt of this communication, Boch turned it over to his parts people for review, and in early August Dave Fritz, who was then Field Operations Manager for SOA, called on Boch to discuss his parts orders. He advised Boch that the parts were peculiar to the 1974 model, and Boch, aware that his dealers had previously complained of parts shortages, and anticipating an increase in both sales and the number of dealers, decided to order a substantial number of parts kits. Accordingly, based on his current sixty-five dealers, Boch ordered two of each type of kit (i.e., dealer and supplemental) for each such dealer, plus thirty-nine extra, or 168 of both dealer and supplemental kits. Plaintiff's Exhibit 69. In reaching this decision, Boch considered that the parts in the kits were such as could be used with the 1974 models, and also that early parts orders were necessary to have the parts available when the 1974 vehicles were delivered.

Boch then took steps to insure that an adequate supply of parts would be available at a guaranteed price. Plaintiff's Exhibit 62; Defendant's Exhibits EEE, FFF, GGG, HHH. He then sought to impress upon his dealers the necessity for early purchase of such parts kits, and his representatives held meetings for this purpose in various parts of New England to explain and solicit orders for parts. When the dealers balked at purchase,[12] Boch scheduled a meeting on November 5, 1973, at a hotel in Dedham, Massachusetts. Plaintiff's Exhibit 11.

At this November meeting, Boch had Brodeur available to explain the necessity of purchase of the parts kits and to answer any questions. In the course of discussion, SNE agreed to reduce the price of its seat-belt tester from $331 to $231, and further conceded that dealers would not have to pay for the kits in advance and that SNE would not substitute fast-moving parts for any parts in the kits.[13] There was also discussion as to recognition by SNE of the Dealers Council, and Boch agreed to do so, provided only that Burtnette resign as an officer thereof. Boch additionally explained that New England sold more Subarus than did the other distributors, and that he knew that the dealers did not wish to lay out substantial sums for purchase of the parts kits, but that such parts were necessary to properly service customers.

James Grappone was present at the November meeting, and although he had not as yet seen the 1974 Subaru,[14] and did not

12. The Dealers Council had reviewed and revised the proposed parts kit list, and submitted such to SNE. Plaintiff's Exhibit 10. The total of the revised list came to $2,033.89, rather than the suggested price of $3,260.78. *Id.*

13. Fast-moving parts may be defined in general as parts which must be replaced on most cars

on a regular basis, such as points, plugs, condensors, and various types of filters.

14. In response to a direct question from the Court, James Grappone advised that he first saw the 1974 Subaru in July or August of 1974.

have available a detailed parts inventory for his own franchise, he felt certain that the proposed parts kits contained unnecessary duplications. Accordingly, he told Boch that it was unreasonable for him to require dealers to purchase the kits as constituted. A bitter discussion ensued, which resulted in Boch's advising James Grappone that if any dealer did not purchase the parts kit, such dealer would receive no allocation of 1974 Subarus. Subsequently, all of the dealers in New England, with the exception of Grappone, purchased the parts kit as suggested. Having done so, they received initial allocations of the 1974 Subarus when same were shipped to the United States, but Grappone's initial orders for such were reallocated among those dealers who had purchased such parts. The result was that no vehicles were shipped to Grappone from September 13, 1973, Plaintiff's Exhibit 113, until placement of its order of July 1974, Plaintiff's Exhibit 13.[15]

Grappone contends that the refusal of SNE to allocate vehicles to it [16] results from conspiracies in restraint of trade performed between (1) SNE and SOA (Count I of Complaint) and (2) SNE and its New England dealers (Count VI of Complaint).[17] It is accordingly urged that such conspira-

cies comprise violations of Section 1 of the Sherman Act, 15 U.S.C. § 1,[18] and Section 3 of the Clayton Act, 15 U.S.C. § 14.[19] We turn our attention to these contentions with full awareness that the antitrust laws were enacted for the protection of competition and not competitors, *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and that each case alleging antitrust violations must be reviewed in light of its own facts and prior cases must be read in the light of their facts. *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1945).

### A. Illegal Tying Agreement or Legal Refusal to Deal

Plaintiff Grappone asserts that SNE's requirement that its New England dealers purchase the 1974 parts kit from SNE as a condition of receiving allocations of 1974 Subarus constitutes an illegal "tying arrangement" forbidden by the antitrust laws. A tying arrangement is "an agreement by a party to sell a product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that

---

15. For reasons having no causal connection to the instant litigation, SNE did not receive any Subaru vehicles for shipment to its dealers during the months of February, March, or April of 1974.

16. It is undisputed that at no time did SNE ever threaten to terminate the franchise of any of its dealers, including Grappone, for failure of such dealers to order the parts from it. Grappone's franchise was in fact renewed for calendar 1974. Defendant's Exhibit TT.

17. The Court will deny the post-trial motion of Grappone seeking to conform the pleadings to the evidence or alternatively to amend its complaint. The reasons for such ruling will be set forth later in the course of this Opinion, which, accordingly, resolves only issues as raised by the remaining counts, *i.e.*, Counts I, II, and VI of the Complaint.

18. 15 U.S.C. § 1 provides in pertinent part: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations, is hereby declared to be illegal.

19. 15 U.S.C. § 14 provides:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

product from any other supplier". *Northern Pacific Railway v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such arrangements are condemned under Section 1 of the Sherman Act as "contracts in restraint of trade". *Baker v. Simmons Company*, 307 F.2d 458, 467 (1st Cir. 1962). Here the tying product alleged is 1974 Subaru vehicles, while the tied product alleged is the 1974 parts kit. Where proven, the evil in tying is that the seller's leverage in the tying product market enables it to "deny competitors free access to the market for the tied product". *Northern Pacific Railway v. United States, supra*, 356 U.S. at 6, 78 S.Ct. at 518.

Defendant SNE argues that its imposition of purchase of the parts kit as a condition for allocation of 1974 Subarus, transmitted to the New England dealers by its principal, Boch, constituted a unilateral refusal to deal which is well established by the seminal case of *United States v. Colgate & Company*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Therein, an indictment based on the theory that Colgate & Company had combined with its wholesale and retail dealers to effect resale price maintenance and had procured adherence through refusals to deal was dismissed in the district court, which interpreted the indictment as not alleging any agreement to maintain resale prices between the defendant and its customers. Holding itself bound by this interpretation of the indictment, the Supreme Court affirmed, stating:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

*Id.* at 307, 39 S.Ct. at 468. Despite critical narrowing by the Supreme Court and extensive criticism by commentators, *Aladdin Oil Company v. Texaco, Inc.*, 603 F.2d 1107, 1113, n.6, 1114, n.7 (5th Cir. 1979), the *Colgate* doctrine still allows individual sellers to refrain from dealing, provided that they merely announce the policy and simply refuse to deal. *United States v. Parke Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). But when the conduct of one alleged to have entered a combination in restraint of trade goes beyond such simple refusal to deal, a necessary element of antitrust violation may be established. *Butera v. Sun Oil Company, Inc.*, 496 F.2d 434, 437 (1st Cir. 1974); *Ford Motor Company v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 879 (1st Cir. 1966).

■ Plaintiff urges that as the conduct here at issue is a tying arrangement or agreement it is illegal *per se*, citing *Northern Pacific Railway Company v. United States, supra*. This argument imposes an initial inquiry upon the Court, as follows:

> The question whether a tying arrangement, in any particular instance, will be deemed so unreasonable as to constitute a *per se* violation of the antitrust laws depends upon the market power the seller possesses over the tying product and the effect of the tie-in on interstate commerce in the tied product. [*Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).] It is only when the seller has sufficient economic power over the tying product to restrain a 'not insubstantial amount' of interstate commerce in the product sought to be tied that the arrangement will be held to be *per se* illegal. *Id.; International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). '[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another . . . .' *Northern Pacific Railway Co. v. United States, supra* at 11, 78 S.Ct. at 521. Thus the three elements of a *per se*

tying violation of Section 1 of the Sherman Act are (1) the conditional sale of two distinct products, (2) economic power over the tying product, and (3) the effect upon a 'not insubstantial' amount of interstate commerce. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). *Rental Car of New Hampshire v. Westinghouse Electric Corporation*, 496 F.Supp. 373, 377, 378 (D.Mass.1980).

### 1. Distinct Products

Turning to the first of these elements, the issue of whether two distinct products are tied to each other, it is here clear that (i) motor vehicle repair and replacement parts are generally sold separately in the automotive industry; (ii) versions of the alleged single product differ in significant respects; (iii) prospective customers may purchase one or more of motor vehicle parts at one time; and (iv) there are a number of outside suppliers who manufacture such parts.[20] *Anderson Foreign Motors v. New England Toyota Distributor, Inc.*, 475 F.Supp. 973, 982 (D.Mass.1979). Accordingly, while the use of Fuji-manufactured parts in the assembly of a Subaru automobile is an important factor in producing the trademarked product, the use of trademarked Fuji parts is not necessary to carry out the essence of a Subaru franchise; that is, the sale of Subaru automobiles. *United States v. Mercedes-Benz of North America*, 517 F.Supp. 1369, 1381 (N.D.Cal.1981). In short, while SNE may require its dealers to maintain a supply of parts to provide servicing to Subaru automobiles, there is nothing inherent in a Subaru franchise or trademark alone that prevents' future replacement parts from being provided by nonapproved sources. *Id.* The evidence presented to this Court demonstrates clearly that SNE conditioned allocation of 1974 Subarus to its New England dealers upon purchase of the parts kits, and the Court accordingly finds that the Subaru automobile and its replacement parts are separate products tied together by the imposition of such requirement. *Id.*

### 2. Economic Power

Economic power over the tying product does not require proof of a tying product monopoly but only that defendant enjoyed sufficient power in the tying product market appreciably to restrain free competition in the tied product market. *Fortner Enterprises v. United States Steel ("Fortner I")*, 394 U.S. 495, 502–03, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). In turn, an appreciable restraint is shown if the seller exercises some control over some of the buyers in the market and enjoys an advantage over competing tying product suppliers. *United States Steel Corporation v. Fortner Enterprises ("Fortner II")*, 429 U.S. 610, 621–22, 97 S.Ct. 861, 868, 51 L.Ed.2d 80 (1977); *Fortner I, supra*, 394 U.S. at 503, 89 S.Ct. at 1258; *Anderson Foreign Motors v. New England Toyota Distributor, Inc., supra*, 475 F.Supp. at 986.

Such economic power can be measured in a variety of ways, including occupation of a dominant position in the tying product market; sufficient uniqueness of product such that the seller has some advantage not shared by competitors in the market for the tying product *supra* or acceptance by a substantial number of customers of the tie-in with no explanations other than the seller's economic power for their willingness to do so. *United States v. Mercedes-Benz of North America, supra*, 517 F.Supp. at 1384. Where, as here, the tying issue involves complaints of franchisees (here the Subaru dealers), many courts have recently held that such franchisees and not the general public-at-large consumer constituted the relevant "consumers" upon whom defendant's economic leverage may be imposed. *Joe Westbrook, Inc. v. Chrysler Corpora-*

---

**20.** SNE argues that at the time it imposed the requirement of purchase of the parts as a condition for allocation of the 1974 Subaru vehicles, it was the only source of supply for such parts, and therefore was justified in the imposi-

tion of the requirement of such purchase. The defense of business justification raised by such a contention will be subsequently addressed in the body of this Opinion.

*tion,* 419 F.Supp. 824, 835 (N.D.Ga.1976). The Court is persuaded by the reasoning of such cases and here holds that the evidence proves that SNE has the power to raise prices or impose other burdensome terms with respect to an appreciable number of buyers, *i.e.,* its dealers, and that this demonstrates its possession of sufficient economic power over the tying product in the market to satisfy the requirements of the *per se* tying rule.[21]

### 3. *"Not Insubstantial" Amount of Interstate Commerce*

The "not insubstantial" test of interstate commerce is broadly interpreted, the controlling consideration being "whether a total amount of business substantial enough in terms of dollar-volume so as not to be merely *de minimis* is foreclosed to competitors". *Fortner I, supra,* 394 U.S. at 501, 89 S.Ct. at 1257 (emphasis in original). The necessary connection with interstate commerce is established by demonstrating that the alleged anticompetitive conduct occurred in interstate commerce. Here, of course, we deal with the requirement imposed upon dealers in the six New England states that they purchase from and through SNE the parts which SNE deemed necessary for repair and/or replacement in 1974 Subaru automobiles. If competitors were foreclosed from access to that portion of the tied product market in the New England area, then plaintiff has satisfied its burden of proof in regard to this tying requirement.

SNE here required its approximately sixty-five New England dealers to purchase a parts kit at an individual price somewhat in excess of $3,200, n. 12, *supra,* and it follows that we here deal with somewhat over $208,000 worth of automotive parts. This is clearly a "not insubstantial" amount, *Moore v. James H. Matthews & Co.,* 550 F.2d 1207, 1216 (9th Cir. 1977) (citing cases showing "not insubstantial" tests met by dollar vol-

umes as low as $60,800). In addition, by conditioning allocation of the 1974 Subarus on the dealer's purchase of the parts kits, SNE demonstrated its economic interest in the tied product, particularly in light of the substantial markup at which it purported to sell these parts kits. *Id.* With the existence of sufficient economic power, coercion is implied from demonstration of the fact that an appreciable number of SNE's New England dealers accepted the burdensome terms of purchase of the parts kits. *Moore v. James H. Matthews & Co., supra,* 550 F.2d at 1216, 1217. The Court finds that a "not insubstantial" amount of interstate commerce was affected by the requirement of purchase of the parts kits in the instant circumstances.

### 4. *Justifications*

█ Despite any *per se* characterization, the defense of business justification for what otherwise would be an illegal tie is available, with the burden of proof resting upon the party asserting such defense. *Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39, 46 (5th Cir. 1976); *Advance Business Systems & Supply Company v. SCM Corporation,* 415 F.2d 55, 68, n. 12 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970).

In addition to urging that the 1974 Subaru and the parts kit here at issue comprise but a single product, SNE offers several justifications for the tying arrangement. Its initial suggestion is that protection of good will, quality control, and integrity of product required that Subaru dealers purchase the parts kits, as less restrictive alternatives were not available. The thrust of this argument is that all parts were manufactured by Fuji or its suppliers in Japan, were not selected by Fuji and SOA until July of 1973, and were urgently needed for service and repair when the 1974 Subarus were released into the market in the late

---

**21.** The evidence before the Court in the instant case is that, with the exception of plaintiff Grappone, most of the New England distributors of Subaru automobiles operated "single point" franchises; that is, they sold only the Subaru make and had considerable investment in and thus economic necessity to continue the operation of the franchises upon such terms as were imposed by SNE.

fall of 1973. SNE also contends that based on the evidence adduced at trial no market for more than five of such parts could be found to be available in the "after market"[22] until at least one year had passed. Defendant additionally contends that it would not be practical to prepare specifications and drawings for the 134 parts contained in the kits which it ordered its dealers to purchase.

However, as we have previously described, the parts deemed necessary for replacement in 1974 Subarus were selected by Robert Hightower, the national warehouse manager for SOA. Without training in automotive mechanics, and lacking the Japanese language, he was able to make his selections with the aid of an interpreter and review of available blueprints and catalogs. He also selected an initial order for kits, which he believed sufficient to cover the original needs of the distributors when the first 1974 Subarus came upon the market. This evidence, as the Court finds, demonstrates that specifications and drawings for the after market would not be as complicated or impractical as defendant contends, and such could in fact be produced within a reasonable period of time. If in fact no after market developed, SNE would have no complaint, for it would most likely be the only source through whom its dealers would purchase necessary replacement parts. Pending the development or lack thereof of an after market, no reason appears why SNE could not have in its own inventory, centrally located as it was, sufficient of the more expensive parts to allow its dealers to purchase such from it as needed in the course of repair and replacement.[23] Overlooked in this course of contention is the fact that it is prevention of the development of a *potential* competing market for replacement parts that here forms the basis for the illegal result of the tie-in. For, as has been aptly stated:

There is general agreement in the cases and among commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, *the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market.* They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry

---

**22.** There are some manufacturers of automotive parts who produce such for use only in the replacement rather than the original assembly process. Such parts are known as "after market" parts, and when manufactured can be acquired directly from independent warehouse distributions who obtain the parts from various sources, including original manufacturers. *United States v. Mercedes-Benz of North America, supra,* 517 F.Supp. at 1374. In the instant case, there was evidence that a number of such distributors existed for parts used in replacement of various foreign automobiles, including Subarus.

**23.** SNE produced much evidence to the effect that distributors did not generally sell without their own regional territories, and pointed out that at least one other Subaru distributor required purchase of parts by its dealers as a condition of allocation of 1974 Subarus. Whatever tendency this may have to prove the existence of illegal restraints of trade in other geographic areas over which this Court has no jurisdiction, and upon which it therefore expresses no opinion, it does fail to demonstrate the lack of potential sources of parts other than SNE from which dealers could procure such parts.

into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers.

*Fortner I, supra* 394 U.S. at 512–13, 89 S.Ct. at 1263 (White, J., dissenting) (footnotes omitted and emphasis added).

As the Court has found that it would not be impractical to supply specifications for substitutes for the parts kit herein, the good-will defense raised by SNE is without merit. *Standard Oil Company of California v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). Nor do we here have any unique or new product such that justification may be grounded upon cases of the genre of *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545 (E.D.Pa.1960), *aff'd* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961), or *Dehydrating Process Co. v. A.O. Smith Corporation,* 292 F.2d 653 (1st Cir.), *cert. denied,* 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961). *Jerrold Electronics* involved a "new business" (community television antenna systems) which required specialized equipment and training at startup such that it was reasonable to tie a service contract to the sale of the equipment for an initial period of time following the inception of the business. *A.O. Smith Corporation* involved the refusal of a manufacturer to sell certain unloaders unless they were installed in presently-purchased or already-owned silos of its own manufacture. The evidence in that case was that despite the defendant's educational efforts, its customers did not install the unloaders as directed, and the silos did not therefore work properly. The circumstances described in cases of this type do not here pertain where only a new model of a foreign automobile, a fairly common occurrence at the times pertinent to this litigation, is involved. The Court finds on the basis of the record to it presented that the purchase provisions of the parts kits were not here intended for

quality control or good will, that most of the parts were or could reasonably be subject to specification, and that the business justifications advanced herein by SNE are without merit.

### 5. The Role of SOA

An agreement or combination violative of the antitrust laws needs not be explicit or formal. *United States v. General Motors Corporation,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966); *American Tobacco Company v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1966); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Business behavior is an admissible type of circumstantial evidence from which the fact finder may infer agreement. *Norfolk Monument Company, Inc. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). Accordingly, a combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. *American Tobacco Company v. United States, supra,* 328 U.S. at 809–10, 66 S.Ct. at 1138–39.

Pointing out that SOA stood to profit from sale of the parts kits, Grappone here suggests that SNE's original decision in August of 1973 to order a large number of such kits resulted from its August 1 meeting (*see* p. 1286, *supra*) with Mr. Fritz of SOA despite the testimony of Fritz to the effect that he merely covered the essential points of the SOA July 25, 1973, letter, Defendant's Exhibit MM, which described the parts kits. As the only notes taken at this meeting (by employees of SNE), Plaintiff's Exhibit 22,[24] comprised computations

---

24. It having been admitted by SNE (Defendant's Response No. 3 to Plaintiff's Requests for Admission of Facts, March 28, 1978) that Exhibit 22 for identification was written by either Mr. Rines or Mr. Hurley, its employees, the Court accepts the argument of Grappone that

such exhibit would be admissible pursuant to Rule 803(3), Fed.R.Evid., and herewith strikes the identification. The Court, however, points out that while such evidence is admissible as to SNE's state of mind as manifested through these employees, it is not admissible to demon-

demonstrating a purported profit to SNE by its sale of dealer kits and supplemental kits to its dealers, plaintiff here argues that the ultimate decision of SNE to restrain trade was the result of a combination or conspiracy between SNE and SOA.

Plaintiff also finds suspicious the visit of SOA's national parts manager, Robert Brodeur, and its vice president of sales, Maurice Gunn, to SNE prior to and during the course of the November 5, 1973, meeting (p. 1286, *supra*) of SNE with its dealers. Grappone suggests that the premeeting conference of these gentlemen with Mr. Boch crystalized Boch's decision to require purchase of his selection of parts kits as a requisite to the allocation of 1974 Subarus. Plaintiff's position is asserted in reliance on *Albrecht v. Herald Company*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), wherein a newspaper publisher required its independent distributors, including Albrecht, to sell its papers at a price no higher than it suggested. When Albrecht raised his prices, the publisher hired Milne Circuit Sales, Inc., to conduct a telephone solicitation campaign designed to convince Albrecht's customers to switch to a new distributor. The publisher also authorized Kroner, another distributor, to deliver papers to customers who desired to switch from Albrecht's route. Both Kroner and Milne were aware that the publisher sought to enforce its retail pricing policy. Illegal conduct was found in the awareness of Kroner and Milne of the anticipated purpose of the publisher's scheme and the fact that they "materially aided in the accomplishment of its plan". *Id.*, 390 U.S. at 150, 88 S.Ct. at 872.

But here the restraint of trade is to be found in SNE's requirement that its dealers purchase quantities of parts determined by SNE, a matter over which SOA, with respect to its varied dealers, had little control. Indeed, Subaru East and George Byers & Son, as of August 1973 the largest of SOA's distributors (with 67 dealers apiece, Plain-

tiff's Exhibit 66), did not order parts in anywhere near the quantities selected by SNE, which at the time had 65 dealers.[25] Surely, if SOA desired to impose a purchase of parts kits and make as large a profit as possible, it would have sought to conspire with its other distributors in this regard.

Additionally, the Court finds that neither prior to nor in the course of the November 1973 meeting between SNE and its dealers did either Brodeur or Gunn suggest to Boch or any other employee of SNE that SNE impose upon its dealers the requirement of purchase of a parts kit as a condition for allocation of 1974 Subarus. Brodeur attempted to explain to the dealers at the meeting the original formulation of the kit and the usefulness of the parts, but when the discussion became heated, he withdrew and took no further part in the proceedings.

█ The law is clear that a mere showing of close relations or frequent meetings between alleged conspirators will not sustain a plaintiff's burden of proving a combination in restraint of trade absent evidence which would permit the inference that such close ties led to an illegal agreement. *Oreck Corporation v. Whirlpool Corporation*, 639 F.2d 75, 79 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 102 S.Ct. 639, 71 L.Ed.2d 618 (1981) (and cases therein cited). On the basis of the evidence presented at trial in the instant case, the Court finds and rules that Grappone has failed to sustain its burden of proof by a preponderance of the evidence of any illegal combination or conspiracy in restraint of trade as between SNE and SOA.

### 6. The Relation of SNE to Its Dealers

Within a short period of time after the November 5, 1973, meeting between SNE and its dealers, the latter, with the exception of the plaintiff, had acquiesced in the requirement that they purchase parts kits as mandated by SNE. SNE, however, con-

strate the state of mind of SOA as manifested by Fritz.

**25.** Subaru East ordered 70 dealers kits and 15 supplemental kits, while Byers ordered 15 dealers kits and 10 supplemental kits. Plaintiff's Exhibit 60.

tinued its efforts to persuade Grappone to join the group by communications both oral and written. On November 27, 1973, James Bothen, vice president and general manager of SNE, contacted Burtnette by telephone to advise him that contingent upon Grappone's purchase of the parts kits SNE was holding seven 1974 Subarus for Grappone. In confirming this telephone conversation, Bothen, under date of November 29, 1973, forwarded a two-page letter to Burtnette, stating therein in pertinent part:

> That I informed you that in keeping our trust with all other SNE dealers and the fact that you would not have the necessary *approved* tools and parts to service the '74 Subaru vehicles that we would not ship the seven (7) units being held for Grappone, Inc., and that these cars would be distributed to other dealers in New Hampshire.

Plaintiff's Exhibit 12, ¶ 5 (emphasis in original).

Bothen's trial testimony affirmed that the meaning of the language "in keeping our trust with all other SNE dealers" was to the effect that each dealer was required to and had purchased parts kits as mandated by SNE and that no deviation would be allowed as to any of SNE's dealers.

■ It is well established that when a manufacturer or distributor goes beyond a simple refusal to deal in attempting to effect compliance with its announced policies, the necessary element of a combination or conspiracy in restraint of trade may be found. *Albrecht v. Herald Company, supra; United States v. Parke, Davis & Company,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Ford Motor Company v. Webster's Auto Sales, Inc.,* 361 F.2d 874, 879 (1st Cir. 1966). If there is existent a specified agreement among the parties, even though

acquiescence in the agreement may have been coerced, then such necessary combination or conspiracy is proven. *Classic Film Museum v. Warner Brothers, Inc.,* 523 F.Supp. 1230, 1233 (D.Me.1981).

The record in the instant case satisfies the plaintiff's burden of proving beyond a preponderance of the evidence that SNE's requirement that its dealers purchase the parts kits as ordered by SNE went beyond a simple refusal to deal, constituted an illegal tying arrangement, and comprised a conspiracy in restraint of trade as between SNE and those dealers who acquiesced in its mandate. The Court finds and rules that as regards the requirement that SNE's dealers purchase parts kits for use with the 1974 model Subarus, the plaintiff has satisfied its burden of proving violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14.[26]

## II. The "Advertising Program" Issue

■ In the span of time commencing in July of 1971 and extending through August of 1974,[27] SOA arranged a regional cooperative advertising program in which it required participation by all its distributors and dealers. Under said plan, each dealer's contribution of $25 per vehicle was procured by invoicing the price as each vehicle was sold to the dealer by its distributor. An additional $25 per vehicle was jointly contributed by SOA and the distributor, and the total of $50 per vehicle for advertising was spent as directed by the distributor for the purpose of advancing Subaru and the related products throughout the distributive region.

In its operation of the plan, SNE chose to use only the media of television ads throughout the New England area.[28] Al-

---

**26.** Having delineated in the body of the Opinion the standards necessary to establish a tie-in under Section 1 of the Sherman Act, we find it unnecessary to address the contention of defendant that the standard necessary to prove such violation under Section 3 of the Clayton Act is virtually identical. *See Moore v. James H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir. 1977).

**27.** SNE and its dealers did not commence participation in this regional cooperative advertising program until September of 1971.

**28.** Certain of these ads were carried on television stations whose broadcast area included Concord, New Hampshire, the geographical situs of plaintiff's dealership. Included among

though the ads did not identify each dealer, they carried at the end of each an invitation to interested parties to call a toll-free telephone number. When those who responded to this invitation were identified, the dealer in their geographical area was advised of this possible sales lead by a card mailed to it.

Television advertising of the type above described had to be booked through an advertising agency which received the standard commission of fifteen percent. During the life of the regional cooperative advertising program, Ernest Boch was the owner of the advertising agencies used by SNE to place the Subaru television advertisements. Boch also placed through such advertising agencies his advertising programs for other motor vehicle franchises in which he had an interest.

Neither SOA nor SNE required any Subaru dealers to advertise exclusively through the regional advertising program. Dealers were encouraged to advertise locally,[29] and it was hoped that they would do so. Grappone chose to absorb the cost of the regional cooperative advertising program rather than pass it on to its customers, but it was not required to do so. No claim was made in the instant litigation, and no proof thereof was advanced to the effect that Boch's advertising agencies overcharged, failed to provide good advertising products, or were in any way less competent than other advertising agencies engaged in the same line of business.

The thrust of the plaintiff's complaint with relation to the regional cooperative advertising program is that it deprived each dealer of the right to use the $25 contributed to such plan as the individual dealer saw fit. Grappone claims that the *per se* tying rule applicable to the parts kits must of necessity be here applied to such advertising programs.

Generally speaking, advertising and other promotional devices are thought to advance and not to impair competition, as advertising is generally calculated to increase sales. *Kestenbaum v. Falstaff Brewing Corporation*, 575 F.2d 564, 571 (5th Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). For this reason, cases which have considered the objection of required contribution to advertising by dealers in automobiles, *Nelligan v. Ford Motor Company*, 262 F.2d 556 (4th Cir. 1959); *Miller Motors v. Ford Motor Company*, 252 F.2d 441 (1958), and allied products, *Kugler v. Aamco Automatic Transmissions, Inc.*, 460 F.2d 1214 (8th Cir. 1972), have generally held that such requirements are not violative of the antitrust laws. And the result is not changed where the manufacturer or distributor maintains unilateral control over the advertising fund. *In re Nissan Antitrust Litigation*, 577 F.2d 910 (5th Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).

Grappone urges, however, that the situation here is closer on its facts to that in *United States v. General Motors Corporation*, 121 F.2d 376 (7th Cir.), *cert. denied*, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941), than those in *Nelligan v. Ford Motor Company, supra*, and *Miller Motors v. Ford Motor Company, supra*, pointing out that in the *General Motors* case, the General Motors Corporation requirement that its dealers finance all of its vehicle sales through its wholly-owned corporate subsidiary, General Motors Acceptance Corporation, was found to be an illegal restraint of trade in violation of the Sherman Act. Significantly, what this argument overlooks is that there is not one iota of proof that the corporate distributor, SNE, held any stock in or itself received one cent of profit from any of the advertising agencies owned by its principal, Ernest Boch. The fact that

such stations was WMUR–TV, Channel 9, Manchester, which is New Hampshire's only commercial television channel.

**29.** The Subaru franchise agreements generally required Subaru dealers not only to place advertisements in local telephone directories but

also "to expend ... in accordance with the directives of Distributor, such other sums for media advertising as are reasonably required to inform and remind the general public of the availability and desirability of [Subaru] Products." Plaintiff's Exhibit 3, Article 6, ¶ 5.

Boch had ownership in more than one business entity on the basis of the evidence presented is considered by this Court to be as irrelevant to the antitrust claims as is the multiple ownership of the Grappone family in various business entities.

Accordingly, the Court finds and rules that the rule of *per se* tie-in has no application to the regional advertising program here at issue, and that judged by the proper rule of reason, plaintiff has here failed to carry its burden of proof that said advertising program was in any way violative of the antitrust laws of the United States. Here apposite is the language of the Court in *In re Nissan Antitrust Litigation, supra.*

Neither are we able to say as a matter of law that it is illegal *per se* to require a local car dealer to contribute to the cost of advertising the product which he intends to sell at a profit after he obtains it from the manufacturer who is vitally interested in the continued prestige, acceptability, and marketability of that product.

We would have a different *per se* case if the manufacturer had fixed a price which the retailer had to follow in actual sales and if the retailer were compelled to contribute to the advertisement of such a fixed price.

Since this is not that kind of case, we hold that the Nissan co-operative advertising program was not a *per se* violation

of the Sherman Act and was due to be appraised under the rule of reason.
*Id.* at 917.

Advertising is of the type of incidental services purchased by the seller for legitimate business reasons, and as such cannot be viewed as a separate or tied product merely because the purchaser is charged for them. *Foster v. Maryland State Savings and Loan Association,* 590 F.2d 928, 932 (D.C.Cir. 1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979). No evidence has been presented in the instant case that either SOA or SNE sought in any way to interfere with the extent of their dealers' local advertising or the sales prices set forth therein. The Court finds and rules that there were ample business justifications for the regional cooperative advertising program as operated by SNE and that such was not in restraint of trade.

*III. The Motion to Conform Pleadings to Evidence or, Alternatively, to Amend Complaint*

Over the vigorous objection of defendant, plaintiff seeks, pursuant to Rule 15(b), Fed. R.Civ.P.,[30] to conform its pleadings to the evidence presented at trial. Alternatively, plaintiff moves pursuant to Rule 15(a), Fed. R.Civ.P.,[31] to amend its complaint by adding certain counts. By such motion, the plaintiff seeks to be allowed to prove attempted monopolization on the part of the defendant in violation of Section 2 of the Sherman

**30.** Rule 15(b), Fed.R.Civ.P., provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a

continuance to enable the objecting party to meet such evidence.

**31.** Rule 15(a), Fed.R.Civ.P., provides:

A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Act, 15 U.S.C. § 2,[32] and violation of a provision of a New Hampshire Statute, RSA 357–B (Supp.1979, Repealed 1981, Superceded by RSA 357–C), designed to regulate business practices between motor vehicle manufacturers, distributors, and dealers.

As defendant points out, previous efforts of plaintiff to introduce these issues by pretrial motions have been "consistently rebuffed". Defendant's Memo in Opposition to Plaintiff's Motion, p. 6. We find it unnecessary to detail the lengthy "travel" of the Court's docket in this regard, but it suffices to point out that the most recent rejection of such attempts came in the course of the final pretrial herein.

 Rule 15(b), Fed.R.Civ.P., is designed for those occasional instances when the course of trial departs so materially from the image of the controversy pictured in the pleadings or by the discovery process that it becomes necessary to adjust the pleadings to reflect the case as actually litigated. 6 Wright & Miller, Federal Practice and Procedure § 1491, p. 453 (1971). However, when the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, absent indication at trial that the party who introduced such evidence was seeking to raise a new issue, the pleadings will not be deemed amended under the applicable provisions of Rule 15(b). *Id.*, § 1493 at p. 466. Or, as has elsewhere been stated:

> As Professor Wright notes, the free amendment features of Rule 15, Federal Rules of Civil Procedure, are designed to facilitate decision of claims on their merits rather than on procedural technicalities. One of the rule's more salutory features is found in the opening sentence of its subparagraph (b): 'When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if

they had been raised in the pleadings.' So we avoid a parsing of the pleadings by the losing party in hopes that some issue, patently tried out with the knowledge of all, was not raised in them. The coin has another side, however; each party is entitled to know what is being tried, or at least to the means to find out. Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere. *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 420 (5th Cir. 1981) (footnote omitted).

 The plaintiff herein claims that the evidence which it produced at trial was sufficient to satisfy its burden of proof of an attempt to monopolize the market for Subaru replacement parts in New England, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Successful proof of such a case must establish both the intent to monopolize and a dangerous probability of success thereat. *George R. Whitten, Jr., Inc. v. Paddock Park Builders, Inc.*, 508 F.2d 547, 550 (1st Cir. 1974), *cert. denied*, 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). The actual or potential exercise of power to which these elements refer for meaning must be assessed in the context of a relevant market. *Id.* The definition of such market is not confined to the perception of the seller. *Id.*, 508 F.2d at 551. There must be evaluation of the reasonable limits of the product's effective competition with other products. *Id.*, 508 F.2d at 552.

Having been rebuffed in a previous decision in its attempt to apply the provisions of the federal "Automobile Dealers' Day in Court Act", 15 U.S.C. § 1221, *et seq.*, to this litigation, *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123 (D.N.H.1975) (Bownes, J.), plaintiff now suggests its right to proceed pursuant to a state counterpart of such statute. Vesting in automobile dealers such as Grappone the right to bring an action for injunctive relief and monetary damages, N.H. RSA 357–B:3(II)

---

**32.** 15 U.S.C. § 2 provides in pertinent part that [e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monop-

olize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.

(Supp.1979), said statute in pertinent part purports to render unlawful as an unfair competitive practice coercion or an attempt to coerce any motor vehicle dealer by a distributor to order or accept parts or accessories. N.H. RSA 357–B:4(II)(a), (b).[33] Such scant authority as is available with reference to said statute casts no light upon the elements necessary to provide proof of coercion. *Sexton Motors, Inc. v. Renault Northeast, Inc.*, 121 N.H. 460, 431 A.2d 116 (1981); *Russ Thompson Motors, Inc. v. Chrysler Corporation*, 425 F.Supp. 1218 (D.N.H.1977) (Bownes, J.). While a search elsewhere might provide some assistance in this regard, *In re General Motors Corporation and General Motors Sales Corporation*, 34 F.T.C. 58 (1941),[34] and while the Court has some doubt as to whether the proof adduced at trial was sufficient to satisfy the requirements of proof under Section 2 of the Sherman Act, 15 U.S.C. § 2, it rules unnecessary any further inquiry into either of such claims.

In the exercise of its discretion, *Scully Signal Company v. Electronics Corporation of America*, 570 F.2d 355, 362–63 (1st Cir. 1977), *cert. denied*, 436 U.S. 945, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978), the Court finds and rules that the issue herein was not tried by the consent of the parties and that to allow the plaintiff's motion to conform the pleadings to the evidence would be prejudicial to the defendant herein.[35] Where the parties do not squarely recognize the issue as such at trial, it cannot be held that there is any implied consent to try such issue. *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 369 (5th Cir. 1980); *Southwestern Stationery and Bank Supply, Inc. v. Harris Corporation*, 624 F.2d 168, 171 (10th Cir. 1980); *MBI Motor Company, Inc. v. Lotus/East, Inc.*, 506 F.2d 709, 711 (6th Cir. 1974). The same reasoning applies to the motions to amend pursuant to Rule 15(a), *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour, supra*, 629 F.2d at 369–70, and, accordingly, Grappone's post-trial Motion to Conform Pleadings to the Evidence or, Alternatively, to Amend the Complaint is herewith denied.[36]

*IV. Damages*

Grappone contends that it is entitled to treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.[37] Proof of damage thereunder is a two-step process involving: (1) showing of a causal connection between the defendant's actions and violation of the antitrust laws with actual injury to plaintiff's business, and (2) once such causal connection is established, plaintiff must quantify the amount of damages by it sustained. *Ford Motor Company v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 883–86 (1st Cir. 1966). Proof of the fact of damages as required by step (1) above is

---

**33.** N.H. RSA 357–B (Supp.1979) was repealed by the New Hampshire Legislature effective August 25, 1981, on which date it was replaced by N.H. RSA 357–C (Supp.1981). The provisions of N.H. RSA 357–B:4(II), which plaintiff here seeks to invoke are now generally set forth in N.H. RSA 357–C:3(II).

**34.** *In re General Motors Corporation and General Motors Sales Corporation*, 34 F.T.C. 58 (1941), involved a finding by the Federal Trade Commission that General Motors had coerced its dealers relative to the purchase of certain parts and accessories. The construction of N.H. RSA 357:B permits courts to be guided by interpretations of the Federal Trade Commission Act, 15 U.S.C. § 45, as from time to time amended. N.H. RSA 357–B:15.

**35.** Had the plaintiff sought prior to the close of evidence to suggest its right to so amend its pleadings, defendant would have been afforded the opportunity to request a continuance to enable it to meet such evidence. Rule 15(b), n.

30, *supra.* Plaintiff's suggestion that such burden might be met by post-trial memos or briefs is without merit.

**36.** In arriving at our resolution of said post-trial motion, we have considered all memos filed by the parties, and accordingly herewith deny defendant's motion to reject the plaintiff's reply memorandum in this regard.

**37.** 15 U.S.C. § 15 provides in pertinent part: Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

satisfied by "proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage". *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969). Plaintiff must establish with reasonable probability the existence of some causal connection between the defendant's wrongful act and some loss of anticipated revenue. *Ford Motor Company v. Webster's Auto Sales, Inc., supra*, 361 F.2d at 883.

█ Plaintiff here alleges that the legal injuries it has sustained consist of the loss of profits resulting from the failure of SNE to allocate Subaru vehicles to it because of the illegal tie-in. The causal relationship between the defendant's misconduct and the plaintiff's injury in this regard must be shown with a "fair degree of certainty". *Ford Motor Company v. Webster's Auto Sales, Inc., supra.*

As we have previously indicated, n. 15, *supra*, no Subarus were shipped from Japan and none were received by SNE during the months of February, March, and April of 1974. The causal factor here was the Arab oil embargo, and when shipments resumed in May of 1974, the price of Subarus had gone up substantially, and they proved difficult to sell. Understandably, SNE's New England dealers, being without product for several months, renewed in April of 1974 their protests to the requirement that they purchase the 1974 parts kits. Plaintiff's Exhibit 57. On April 30, 1974, SNE advised its dealers that they would be relieved from further purchase of the remainder of said parts kits. Defendant's Exhibit F.

On the same date, April 30, 1974, Grappone sought to order forty-two Subarus from SNE. Plaintiff's Exhibit 81.[38] However, it received no vehicles until, following another order on July 2, 1974, Plaintiff's

Exhibit 13, SNE shipped to it twenty-one vehicles in the latter part of the same month. Plaintiff's Exhibits 14, 15. Even at that late date, SNE attempted to condition such shipments upon purchase by plaintiff of a substantial portion of the 1974 parts kit. Plaintiff's Exhibits 14, 15, 16, 17. The evidence is therefore clearly sufficient to meet the plaintiff's burden of proving, as the Court finds it here has done, the *fact* of damage by it sustained as the result of SNE's refusal to allocate to it vehicles between November 1973 and July 1974.

As regards the second step in damage proof, the quantification of damages, the plaintiff is not held to a rigid standard of proof regarding the *amount* of damages, since in such cases economic harm is frequently intangible and difficult to quantify. *Story Parchment Company v. Paterson Parchment Paper Company*, 282 U.S. 555, 562–65, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931). Damages, however, may not be merely speculative, and there must be reasonable evidence from which the fact finder can rationally infer the amount thereof. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Ford Motor Company v. Webster's Auto Sales, Inc., supra*, 361 F.2d at 885–86.

Plaintiff, however, does not seek to limit its damages to such as flow from the failure of it to receive vehicles from SNE for the period between November 1973 and July 1974, but goes further and contends that the damage to its good will caused it, for practical purposes, to "start over", and that its damages measured by profit losses extended through June of 1976. As to be expected, defendant objects strenuously to both the claim of fact and the amount of damages, pointing out that where illegal tie-ins are proven, the ordinary measure of damages would be the difference between the price actually paid for the tied product

**38.** Plaintiff's Exhibit 81 is a "Dealer Contact Report" of April 30, 1974, wherein the district sales manager assigned to Grappone's territory reported to SNE on a form provided in pertinent part for such purpose that he "obtained order this date (42 units)". Although SNE contends that it did not accept orders for new vehicles except when same were in writing, the report form provides space for and clearly indicates that new vehicle orders were contemplated with the use of such form. The Court finds accordingly that, as stated in the body of the Opinion, Grappone did seek to order 42 new Subarus as of April 30, 1974.

and the price at which the product could have been obtained on the open market. *Bell v. Cherokee Aviation Corporation*, 660 F.2d 1123, 1133 (6th Cir. 1981); *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344 (6th Cir. 1975). It follows, defendant urges, that inasmuch as no evidence was adduced as to the price at which the product could have been obtained on the open market, plaintiff has failed in its burden of proof. This reasoning overlooks the rule that in extraordinary cases the plaintiff might be able to establish a causal relationship between a tying arrangement and other kinds of economic injury. *Pogue v. International Industries, Inc.*, supra, 524 F.2d at 345, *citing Deaktor v. Fox Grocery Company*, 475 F.2d 1112, 1116–17 (3rd Cir. 1973), *cert. denied*, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973). As we have here found that it is the *potential* market that is affected by the illegal tie-in, we turn our attention to plaintiff's theories of damage and the proof presented in support thereof.

Understandably, Grappone seeks to maximize its damages through an approach which the Court finds accurate to describe as a blend of fact and fiction. Dividing the period of damage calculations by varied calendar months, plaintiff arrives at a single damage amount in excess of $125,000, which it contends flowed to it from the illegal tie-in of the parties. These figures upon careful review appear to be derived in part from actual financial records of plaintiff, but in other instances arbitrary methods of determination of and allocation of expense and income items have been made, which the Court does not believe comport with the actual evidence.

At the outset, the Court takes the position that the proper measure of damages to be considered is the overall business loss sustained by Grappone for such period as it was without the Subaru line, *i.e.*, the com-

petitive injury to its business, and, under its duty to mitigate damages, it would have been remiss if it had not taken reasonable steps to merchandise its substitute lines. *See Borger v. Yamaha International Corporation*, 625 F.2d 390, 398–99 (2d Cir. 1980). The Court rejects plaintiff's contention that no decrease in overhead or allocation thereof was necessitated by its loss of Subaru product as a result of the illegal tie-in, and, accordingly, proceeds with computations which eschew the arbitrary figures relative to profit from service and allocations of overhead that are not related to the actual figures demonstrated by available business records apparently prepared not for the purposes of litigation but for tax and regular business purposes.

We consider first the two remaining months of 1973 (November and December) and the initial month of January 1974 in one item because these three months were months when Subarus were available but were not allocated to the plaintiff because of its refusal to purchase the parts kit. We reject, however, plaintiff's contention that it could have sold as many as twelve Subarus per month during this period, for the records demonstrate that in 1973 (for ten months), its best year, Grappone sold 76 Subarus, or an average of approximately eight per month. The Court accordingly allocates for computation purposes to Grappone eight Subarus, or 24 for the three months outlined, and examination of the 1973 financial statement of plaintiff (Defendant's Exhibit Z) reveals that the gross profit per Subaru unit sold for that year was in the amount of $263.84. Accordingly, the Court finds that for the three months of November and December 1973 and January 1974 plaintiff would have received a gross profit of $6,332.16 (24 $\times$ $263.84) from the sale of 24 Subarus. The overhead to be allocated, however, is 12½%,[39] or the sum of

---

39. The overhead allocation of 12½% is derived from a combination of two figures. In 1973, Grappone sole 531 new vehicles, of which 76, or 14%, were Subarus. Defendant's Exhibit Z. In the same year, its gross profit was in the amount of $191,006.83, of which $20,051.53, or 11%, was contributed by the sale of Subarus.

*Id.* The average of the two percentage figures (14% and 11%), or 12½%, was accordingly found by the Court to be the proper allocation of overhead to the sale of Subaru for the period in question. As we have indicated previously (p. 42), no vehicles were available to SNE or any of its dealers during the months of

$791.52 ($6,332.16 × .125), and the net profit or damages to be awarded Grappone in this regard is, accordingly, $5,540.64 ($6,332.16 minus $791.52).

The second period of damages to be computed is that for the months of May and June 1974. As we have earlier indicated (p. 42), Grappone sought to order Subarus at the end of April, but received none until July of 1974. Finding that it should have received eight Subarus per month, or 16 for those two months, and that the financial records of plaintiff for 1974 (Plaintiff's Exhibit 42) indicate the gross profit per Subaru to be $438.76, the Court computes gross profit loss for such vehicles to be in the sum of $7,020.16, less overhead of 6%,[40] or $421.21, making the lost net profit to be the amount of $6,598.95.

For the six remaining months of 1974 (July through December), the Court bears in mind that there had been a substantial increase in prices, and a rebate program was instituted during that period of time. Examination of the dealer evaluation reports for 1974, Defendant's Exhibit WW, with reference to the New Hampshire dealers, indicates that they averaged 22 vehicles apiece, and as plaintiff sold 18 Subarus, the Court finds it would be entitled to four additional sales at the gross profit per unit of $438.76, or a total of $1,755.04, less 6% overhead ($1,755.04 × .06) of $105.30, for net profit damages in the amount of $1,649.74.

Turning now to the calendar year 1975, it is to be borne in mind that in September of 1974 Grappone canceled its order for 21 vehicles and did not resume requests for product until May of 1975. Examination of the dealer evaluation reports for 1975 (Defendant's Exhibit XX) indicates that New Hampshire Subaru dealers averaged delivery of approximately 75 vehicles on an annual basis, but as plaintiff did not order product for approximately one-half of that time, it would be entitled to 38 new vehicles. Having sold 24 vehicles during that calendar period (June through December 1975), we compute its damages at 14 additional vehicles times the gross profit per vehicle (Defendant's Exhibit W) of $283.35, for a total of $3,966.90. The overhead to be applied to these computations is 13%,[41] or $515.70 ($3,966.90 × .13), which leaves net profit damages for 1975 in the amount of $3,451.20.

Plaintiff additionally claims that it is entitled to damages for the first six months of 1976, but the Court finds and rules that it is not entitled to any award for this period of time. The dealer contact reports make clear that, whatever the extent of advertising of Subarus, at this time it was minimal. A temporary sign hauled in place by a truck was used and new automatic transmission vehicles were refused, and it was not until late April or early May of 1976 that plaintiff decided to "change its image" and to attempt to become a full-time Subaru dealer, giving to this product the share of attention and priority it deserved in accordance with its contribution to the overall profit picture.

In sum, the Court finds and rules that the proper computation of the damages sustained by plaintiff as a result of the illegal tie-in of the parts kits amounts to single

---

February, March, and April of 1974 due to the oil embargo, and when shipments were resumed in May of that year, the price of the vehicles had gone up substantially, and they proved difficult to sell. Our computations change accordingly, commencing with the allocations which we find should have been made to Grappone after such shipments were available.

**40.** In 1974, Grappone sold 358 new vehicles, of which 18, or 5%, were Subaru. Its gross profit from the sale of new vehicles for said year was in the amount of $110,811.56, of which $7,897.72, or 7%, resulted from the sale of Subarus. Plaintiff's Exhibit 42. The average of those two figures (5% and 7%) equals 6%, which the Court finds to be the proper allocation of overhead for the period in question.

**41.** In 1975, Grappone sold 507 new vehicles, of which 69, or 14%, were Subaru. Its gross profit on such sales amounted to $157,282.36, of which $19,551.05, or 12%, was the result of Subaru sales. Defendant's Exhibit W. The average of those figures (14% and 12%) equals 13%.

damages of $17,240.53, which, when trebled in accordance with the statute, 15 U.S.C. § 15, amount to $51,721.59. Plaintiff is also entitled to attorney's fees, and the method by which whose are to be addressed will be detailed by the Court in a supplemental Order of even date.

*V. Conclusion*

The plaintiff has established to the satisfaction of the Court by a preponderance of the evidence its right to recover damages pursuant to Count VI only of its Complaint for the illegal tie-in arising from the requirement that it purchase the 1974 parts kit as a condition of allocation of 1974 Subarus. It is to be awarded single damages in the amount of $17,240.53, which, trebled pursuant to the statute, 15 U.S.C. § 15, amounts to $51,721.59. It will also be awarded attorney's fees at a future date.[42]

The foregoing shall comprise the findings and rulings of the Court pursuant to Rule 52(a), Fed.R.Civ.P. All requests for findings of fact and rulings/conclusions of law which have not been inferentially granted hereinabove are herewith denied.

Inasmuch as the issue of attorney's fees remains to be dealt with, the Clerk is instructed that judgment shall not be entered until that issue is resolved.

SO ORDERED.

## SUPPLEMENTAL ORDER

As of this date, the Court has entered its Memorandum Opinion awarding damages to plaintiff under Count VI of its complaint. The issue of attorney's fees remains to be dealt with, and counsel for the plaintiff are herewith instructed to file with the Clerk of this Court not later than 5 p. m. on Wednesday, March 31, 1982, their detailed statement of such claimed fees. If desired, a memorandum of law in support of such claim may also be filed at said time and date.

The Court additionally desires, whether included by way of affidavit or in the memos, the following information:

1. Whether by any agreement between counsel and plaintiff a contingency award was to be made, and, if so, the basis of such contingency award of fees to plaintiff's counsel.

2. The hourly rate at the times covered by the statement of attorney's fees for each attorney (who shall be identified therein by initials) listed as involved in the work leading to such claimed fees.

3. A general outline of any other work which counsel were required to refuse as a result of being required to prepare and try the instant litigation.

A copy of the aforesaid documents shall be provided promptly to opposing counsel, and counsel for the defendant shall file with the Clerk of this Court not later than 5 p. m. on Friday, April 9, 1982, its opposition, if any, to any claimed fees, and memos in support thereof. The Court contemplates that it will resolve the issue on the documentation thus furnished and that no further hearings will be necessary with reference thereto.

SO ORDERED.

42. *See* Supplemental Order of even date.